No. <u>22-1326</u>

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

CHRISTIAN FENICO, *et al*.

*Plaintiffs-Appellants*,

v.

CITY OF PHILADELPHIA,

*Defendant-Appellee.*

Appeal from Order Granting Motion To Dismiss in Civil Action No.
2:20-cv-03336-PBT in the United States District Court for the Eastern District
of Pennsylvania (Honorable Petrese B. Tucker)

## BRIEF OF PLAINTIFFS-APPELLANTS

LARRY L. CRAIN
Crain Law Group, PLLC
5214 Maryland Way, Suite 402
Brentwood, TN 37027
(615) 376-2600

JONATHAN J. SOBEL
Law Offices of Jonathan J. Sobel
1500 Walnut Street, Suite 2000
Philadelphia, PA 19102
Tel. (215) 735-7535

*Counsel for the Plaintiffs-Appellants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ............................................... 1

ISSUES PRESENTED ................................................................. 1

STATEMENT OF THE CASE ...................................................... 2

STATEMENT OF FACTS ........................................................... 2

SUMMARY OF ARGUMENT ..................................................... 16

STANDARD OF REVIEW ........................................................... 18

ARGUMENT ............................................................................... 19

I.     The Plaintiffs Sufficiently Allege That Their
       Punishment Was Retaliatory And Based On Their
       Private Speech Regarding Matters of National
       Public Concern ............................................................. 19

       A. The Plaintiffs' Speech Addressed Issues of Public
          Concern ..................................................................... 19

       B. The Plaintiffs' Speech Was A Substantial or Motivating
          Factor in the Alleged Retaliatory Action ................. 24

II.    The District Court Erred In Applying A *Per Se* Disruptive"
       Test ............................................................................... 25

       A. The District Court's Use of The "Giglio List" As A
          Factual Basis For Disruption Is Unsupported .......... 27

III.   The Plaintiffs Sufficiently Allege A Claim For Retaliation
       Based Their Exercise of Their First Amendment
       Protected Speech ......................................................... 28

A. The Defendant Cannot Show That It Would Have
   Taken The Adverse Action Had Not The Plaintiffs
   Engaged In Protected Conduct .................................................. 30

CONCLUSION ............................................................................... 30

CERTIFICATIONS ......................................................................... 32

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Connick v. Myers*,
　　461 U.S. 138, 145, 103 S.Ct. 1684,
　　75 L.Ed.2d 708 (1983)…………………………..…………………*passim*

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
　　472 U.S. 749, 758-759,105 S.Ct. 2939, 86 L.Ed 2d 593 (1985)…….…...19

*First Nat. Bank of Boston v. Bellotti,*
　　435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed2d 707 (1978)…………..…..19

*Garrison v. Louisiana*,
　　379 U.S. 64, 74-75, 85 S.Ct. 209, 13 L.Ed2d 125(1964)……..…………20

*Garrity v. New Jersey,*
　　385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967)………..…30

*Giglio v. United States*,
　　405 U.S. 150 (1972)……………………………………………..…15

*New York Times Co. v. Sullivan,*
　　376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed2d 868 (1964)……….….…….20

*Pickering v. Bd. Of Educ. Of City Sch. Dist. Of City of New York,*
　　336 U.S. 563 (1968)…………………………………………….. *passim*

*Rankin v. McPherson*,
　　483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)………..…...23

*Snyder v. Phelps*,
　　562 U.S. 443, 454 (U.S. 2011)……………………………..……..26

*W. Va. State Bd. of Educ. v. Barnette,*
　　319 U.S. 624, 642 (1943)………………………………………………19

# FEDERAL CIRCUIT COURT CASES

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
654 F.3d 462, 469 n. 9 (3d Cir.2011)………………………………..17

*Baldassare v. State of N.J.*,
250 F.3d 188, 194-95 (3rd Cir. 2001)…………………………..17, 22, 29

*Baloga v. Pittston Area School District*,
927 F.3d 742, 752 (3rd Cir. 2019)………………………………………...29

*Biggs v. Village of Dupo*,
892 F.2d 1298, 1303 (7th Cir.1990)………………………………………...30

*Curinga v. City of Clairton*,
357 F.3d 305, 309, 310 (3d Cir. 2004)…………………16, 17, 21, 22, 24

*Czurlanis v. Albanese*,
721 F.2d 98, 103 (3d Cir.1983)………………………………………...22

*Evancho v. Fisher*,
423 F.3d 347, 350 (3d Cir.2005)…………………………………….………18

*Flora v. Cnty. of Luzerne*,
776 F.3d 169, 175–76 (3d Cir. 2015)………………………………………17

*Foglia v. Renal Ventures Mgmt., LLC*,
754 F.3d 153, 154 n. 1 (3d Cir.2014)………………………………….………18

*Green v. Philadelphia Housing Authority*,
105 F.3d 882, 885-86 (3rd. Cir.1997)…………….………………20, 22

*Hill v. Borough of Kutztown*,
455 F.3d 225, 242 (3rd Cir.2006)………………………………………23

*Holder v. City of Allentown*,
987 F.2d 188, 194 (3d Cir.1993)………………………………………22

*Johnson v. Lincoln Univ.*,
    776 F.2d 443, 454 (3d Cir.1985)…………………………………...22, 25

*Maio v. Aetna*,
    221 F.3d 472, 482 (3d Cir.2000)……………………………………18

*Miller v. Clinton Cty.*,
    544 F.3d 542, 550 (3d Cir.2008)…………………………………26, 29

*O'Donnell v. Yanchulis*,
    875 F.2d 1059, 1062 (3rd Cir. 1989)………………………………30

*Palardy v. Township of Millburn*,
    906 F.3d 76, 80-81 (3rd. Cir. 2018)………………………………..29

*Phillips v. Cty. of Allegheny*,
    515 F.3d 224, 228 (3d. Cir. 2008)…………………………………18

*Pro v. Donatucci*,
    81 F.3d 1283, 1288 (3d Cir.1996)………………………………...16, 22

*Suppan v. Dadonna*,
    203 F.3d 228, 233–35 (3d Cir. 2000)……………………………..29

*Thomas v. Indep. Twp.*,
    463 F.3d 285, 296 (3d Cir. 2006))………………………………..29

*Watters v. City of Philadelphia*,
    55 F.3d 886, 891, 899 (3d Cir.1995)………………………*passim*

*Zamboni v. Stamler*,
    847 F.2d 73, 79 n. 6, 80 (3d Cir. 1988)…………………………..25, 29

**STATUTES**

28 U.S.C. § 1291……………………………………….……………1

28 U.S.C. § 1331……………………………………….……………1

42 U.S.C. § 1983……………………………………………………………1, 2

**RULES**

Fed.R.Civ.P. Rule 12(b)(6) ……………………………………….……………..2

**SECONDARY SOURCES**

https://www.pewresearch.org/internet/2018/07/11/an-analysis-of-blacklivesmatter-and-other-twitter-hashtags-related-to-political-or-social-issues/  (last visited May 29, 2020)……………………………………………………………………3

https://www.fbi.gov/news/press-releases/press-releases/fbi-releases-2018-statistics-on-law-enforcement-officers-killed-in-the-line-of-duty  (last visited May 30, 2022)……………………………………………………………………3

J. S. Warren, *The Scarlet Letter:  North Carolina, Giglio, and the Injury In Search of a Remedy*, 12 Wake Forest L. Rev. Online 24, 26–27 (February 28, 2022)...…28

## <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction over the original claims in this civil action under 28 U.S.C. § 1331 because those claims were asserted under 42 U.S.C. § 1983.  On January 26, 2022, the district court entered a final order granting the motion to dismiss in favor of the defendant, City of Philadelphia, resolving all issues presented in this case.  On February 23, 2022, the Plaintiffs Christian Fenico, Thomas Young, Thomas Gack, Edward McCammitt, Tanya Grandizo, Anthony Anzideo, William Bowdren, Joseph Przepiorka, Kristine Amato, Raphael McGough and Francis Sheridan filed a timely notice of appeal.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>ISSUES PRESENTED</u>

The Plaintiffs were each disciplined, suspended or terminated from the City of Philadelphia Police Department for exercising their free speech rights as guaranteed by the First Amendment of the United States Constitution and expressing their private views on issues of inherent public interest.  Should this Court reverse the district court's holding that the City of Philadelphia was justified in restricting the Plaintiffs' exercise of their free speech rights? (J.Appx. 5-35, Mem. Op.).

*Suggested answer:*  Yes.

## STATEMENT OF THE CASE

This action originated with the filing of a complaint on July 8, 2020, seeking compensatory damages and declaratory relief under 42 U.S.C. § 1983 against the City of Philadelphia for its retaliatory discipline of nine police officers based on their exercise of their right of free speech under the First Amendment.  (Dkt. No. 1).  An amended complaint was subsequently filed on October 7, 2020, adding three additional plaintiffs. (J.Appx. 36, Amd. Compl.). On November 2, 2020, the Defendant filed a motion to dismiss under Rule 12(b)(6) Fed.R.Civ.P. (Dkt. No. 18).  On January 26, 2022, the district court entered an order granting the Defendant's motion to dismiss. All of the named plaintiffs timely filed a notice of appeal on February 23, 2022. (J.Appx. 1, Notice of Appeal).

## STATEMENT OF FACTS

The Plaintiffs-Appellants in this case are highly decorated members of the Philadelphia Police Department. Some have been shot in the line of duty.  All have been honored with multiple awards for their dedication and sacrifice and meritorious service to the department, including for many the Medal of Valor. Prior to the events giving rise to this litigation, none had ever been disciplined. (J.Appx. – 9, Mem. Op.).

During 2018 and 2019, the United States witnessed widespread violence and protests in multiple cities across the country. Mass shootings hit a record high

in December 2019, and violent hate crimes were markedly on the rise. July of 2018 marked the fifth anniversary of the Black Lives Matter movement, which began following the acquittal of George Zimmerman in the shooting death of unarmed black teenager Trayvon Martin. One Pew Research Center analysis of public tweets found the BLM hashtag was used nearly 30 million times on Twitter – an average of 17,002 times per day – as of May 1, 2018.[1] According to statistics reported to the FBI, 106 law enforcement officers were killed in line-of-duty incidents in 2018.[2]

It is within this cultural milieu that the Plaintiffs chose to exercise one of the most coveted constitutional rights guaranteed by the United States and the Tennessee Constitutions: the right to free speech.

The Defendant does not contest that the Plaintiffs' speech was private in nature and addressed issues of public concern.  (J.App. 25-26, Mem. Op.). The Plaintiffs were disciplined, at least in part, based on the political views they expressed, while officers espousing opposing political views or positions were never subjected to any discipline. (J.App. 83-87, Amd. Compl.).

---

[1] https://www.pewresearch.org/internet/2018/07/11/an-analysis-of-blacklivesmatter-and-other-twitter-hashtags-related-to-political-or-social-issues/ (last visited May 29, 2020).

[2] https://www.fbi.gov/news/press-releases/press-releases/fbi-releases-2018-statistics-on-law-enforcement-officers-killed-in-the-line-of-duty  (last visited May 30, 2022).

On June 1, 2019, an entertainment web publisher called <u>Buzzfeed News</u> published a story headlined: "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Think On Facebook. Here's the Proof". The article was published in collaboration with Injustice Watch, a self-described "nonprofit newsroom focused on exposing institutional failures that obstruct justice and equality." Injustice Watch and <u>Buzzfeed</u> relied, as their primary source for the article, on a database called the Plain View Project. (J.Appx. 36, Amd. Compl. ¶1).

The Plain View Project ("PVP") was founded in 2016 by Philadelphia attorney Emily Baker-White. In 2017, Baker-White and a team of other attorneys conducted an investigation into social media activity by police officers in eight major cities spanning several years. PVP's stated goal was to publicly expose any social media posts by law enforcement officers which it subjectively found offensive or hinted of any bias or racism. (J.Appx. 36, Amd. Compl. ¶2).

During the relevant time period of the events, the City of Philadelphia Police Department had in force and effect a policy known as Directive 6.10, Social Media and Networking which specifically disclaimed any sponsorship or endorsement by the City of Philadelphia or the Philadelphia Police Department of any social media position taken by an employee:

**Directive 6.10. Social Media and Networking**

 G. Employees who are off-duty, and using privately-owned property to engage in the personal use of social media, do not represent the City of

Philadelphia, the Philadelphia Police Department, or any official position maintained by either entity. Under such conditions, employees represent only themselves and their personal interests.

(J.Appx. . ¶4).

It is undisputed that each of the Plaintiffs' comments which presumably formed the basis for their discipline were made by them while off-duty, in their personal capacity as a private citizens, and addressed matters of political, social or other concern to the community. (J.Appx. -25, Mem. Op.).

At the time the Plain View Project was launched in June of 2020, not one of the Plaintiffs identified themselves in the biographical information of their Facebook pages as officers or employees of the City of Philadelphia. (Dkt.. 24, Pl.'s Memo of Law in Res. To Def. Mot. Dismiss p. 13).

The Defendant's negative employment actions against the Plaintiffs were motivated entirely by the Plaintiffs' speech activity. (J. Appx.36, Amd. Compl. at ¶¶ 69, 87, 136, 183, 223 and 253.)

There is no evidence in the record that the Plaintiffs' private speech resulted in any material disruption within the Department, even though the Defendant has argued, without any proof, that every comment by the Plaintiffs' was *per se* disruptive.

There is no evidence in the record to suggest that the Plaintiffs' Facebook posts, many of which date back six or more years, and still actively displayed on their Facebook accounts in June of 2019.

### Plaintiff Christian Fenico

Christian Fenico was employed by the City as a commissioned police officer in 2003. Nowhere on his personal Facebook webpage or in his biographical hyperlink did he identify himself as an employee of the City of Philadelphia or even as a police officer. He also used a pseudonmyn "Chris Joseph" when posting to his Facebook. (J.Appx. 36, Amd. Compl. ¶ 33).

The Facebook posts shown to Mr. Fenico dated back as early as 2012 and condemned racism. As an example, one of them depicted celebrity Jamie Foxx ranting "I kill all white people." (J. Appx. 36, Amd. Compl.)

On July 17, 2019, Officer Fenico was summoned to his Captain's office regarding his personal Facebook comments dating back to as early as 2012, and summarily terminated for "conduct unbecoming" and "neglect of duty". (J. Appx. 36, Amd. Compl. ¶ 49).

### Plaintiff Thomas Young

On June 5, 2019, Mr. Young was placed on restricted duty, told to surrender his service weapon and summarily relieved of all duties after being shown several excerpts from his personal Facebook posts addressing such topics as the burning of

a U.S. flag by Islamic extremists, the assassination of a French Chief of Police by a Muslim terrorist, threatened violence by Somali terrorists, persecution of Christians in Muslim-controlled regimes and a news report of leniency in the prosecution in a child rape and molestation case. (J.Appx. 5, Amd. Compl. at ¶ ¶ 76, 81 and 86).

### Plaintiff Thomas Gack

Thomas Gack has been employed by the Department since 1993. On June 7, 2019, his Captain came to his home, retrieved his service pistol, and informed him that he was under investigation because of the <u>Buzz Feed News</u> article.   The topics discussed in his Facebook posts addressed issues of public concern, including ISIS, Terrorism, Child Molestation, Violent Protests, AntiFa and political commentary during the presidential election cycle. (J.Appx. 5, Amd. Compl. ¶ 108).

On July 19, 2019, he was summarily terminated.  The bases cited for his termination were conduct unbecoming and neglect of duty. (J.Appx. 5,  Amd. Compl. at ¶¶ 103-105).

### Plaintiff Edward McCammitt

Edward McCammitt was employed by City as a commissioned police officer in 1986. (Doc. 11-1, Pl.'s Amd. Compl. ¶110). On June 18, 2019, he was called into his Captain's office, placed on restricted duty, instructed to turn in his service weapon and stripped of all his police duties. (J.Appx. 36, Amd. Compl. ¶ 110-125). Thirty days later, on July 19, 2019, he attended an IAB meeting in which copies of

his Facebook posts dating back to 2015 -2017 were shown to him and he was ordered to turn in his badge, identification and equipment.  The two cited bases for the City's disciplinary action were conduct unbecoming and neglect of duty. *Id*.

Mr. McCammitt did not identify himself on his Facebook page as a police officer or employee of the City of Philadelphia. Among the topics of national interest discussed by him on Facebook were the following: AntiFa Violence, Islamic Terrorism, the capture of fugitive terrorist Salah Abdeslam, Dishonor of Military Veterans and ISIS.  The Defendant only referenced two of Mr. McCammitt's posts from 2016 and 2017 in its Motion To Dismiss; however, these were never specifically cited as the basis for the Department's disciplinary action. (J.Appx. 36, Amd. Compl. ¶¶ 133-135).

### Plaintiff Tanya Grandizo

Tanya Grandizo was employed as a commissioned police officer in 1995.  She did not identify herself as a police officer with the City of Philadelphia Police Department on her social media. In June of 2019, she was notified that she was the target of an internal investigation regarding some "questionable" posts on Facebook. She was placed on restricted duty pending this investigation. (Doc. 11-1, Pl.'s Amd. Compl. ¶¶144).

In March of 2020, she received a 30-day suspension because of certain personal speech on her Facebook account dating back to 2013 which addressed

issues regarding incidents of Islamic terrorism in cities around the world.  (J.Appx., 36, Amd. Compl. ¶¶ 138-152).

## Anthony Anzideo

Detective Anthony Anzideo was employed by the City as a commissioned police officer on February 12, 2007.   On approximately June 7, 2019, he was contacted by his superior, Lt. Biello who advised that he had been instructed by Internal Affairs to place Det. Anzideo on restricted duty and take his service firearm. (J.Appx. 36, Amd. Compl. ¶ 163). At the time he was disciplined,  Det. Anzideo had a spotless thirteen-year record.

On June 13, 2019, he was summoned to Internal Affairs interview and was shown Facebook posts dating back to 2010-2016 consisting of such posts as his comment on the Boston Marathon bombing,  and a February 13, 2014 comment with a video link to a news broadcast about rioting and violence in Oakland, California. One week later, on July 22, 2019, he received his first set of "75-18s", a term used to refer to disciplinary reports generated as a result of the investigation into his Facebook activity. He was also cited with neglect of duty. (J.Appx. 36, Amd. Compl. ¶¶ 170-171) and later suspended.

## Plaintiff Anthony Acquaviva

Anthony Acquaviva was employed as a commissioned police officer in 1990. On June 5, 2019, he was removed from active duty and ordered to surrender his

service weapon pending an investigation regarding his private use of social media. On July 17, 2019, he was compelled to retire from his 29-year career in law enforcement in order to preserve his medical coverage for his family, including his invalid, bed-ridden daughter. (J.Appx. 36,  Amd. Compl. ¶¶ 199-201).

Mr. Anzideo did not identify himself as a police officer with the Department or as an employee of the City of Philadelphia.  All of his Facebook posts date back to 2015-2016, and discussed issues of public concern.

### Plaintiff Kristine Amato

Kristine Amato was employed as a commissioned police officer in 1990. On or about June 5, 2019, she was ordered to meet with her superior, Captain Vales, who instructed her to surrender her service weapon.  She was assigned to desk duty where she remained for approximately 53 days.   Shortly thereafter, she was ordered to report to Internal Affairs to discuss her social media posts. During this interview, she was shown approximately twelve Facebook posts and was instructed to initial each post acknowledging them as her posts.

Nowhere on her personal Facebook webpage or her biographical hyperlink did Officer Amato identify herself as an employee of the City of Philadelphia or as a police officer, and used a pseudonym "Yo Stuff". (J.Appx. 36, Amd. Compl. ¶ 209). The Facebook posts cited to her by the Department dated back as early as

January of 2012, and did not originate with her. Instead, the pages shown to her were merely excerpts of her comments on Facebook posts by other individuals. *Id.*

Ms. Amato was given a choice of accepting a thirty 30-day suspension or requesting a PBI hearing. She elected to plead not guilty and requested a hearing. While waiting for her hearing, she was informed that the Department had decided, despite her hearing request, to proceed with discipline and she was suspended for thirty days without pay. (J.Appx. 36, Amd. Compl. ¶216 - 218).

Ms. Amato's personal comments discussed such topics as the refugee crisis in Mexico, violent protests in Philadelphia over immigration. *Id.*

### Plaintiff Joseph Przepiorka

Joseph Przepiorka began as a commissioned police officer in 1989. On June 4, 2019, he was ordered to surrender his service weapon. Over the course of his thirty year career in law enforcement, Mr. Przepiorka maintained a spotless record, and each year his performance reports rated him as a valued asset to the police department. (J.Appx. 36, Amd. Compl. ¶¶ 229-231). Despite his unblemished record, he was suspended for thirty days based on Facebook posts dating back more than four years prior to the Buzzfeed article. *Id.*

Mr. Przepiorka did not identify himself as a police officer or employee of the City of Philadelphia on his Facebook page. He was never informed by the Defendant

which of his Facebook posts were the basis of his disciplinary action. The vast majority of his posts discuss issues of national and public concern.

### Plaintiff William Bowdren

William Bowdren was employed as a commissioned police officer in July of 1996. On June 7, 2019, his commanding officer came to his residence to collect his service weapon and to advise him that he was the subject of an Internal Affairs investigation.  During the investigation, he was assigned to desk duty.

On August 22, 2019, Mr. Bowdren was ordered to sign a set of "75-18" disciplinary documents. He plead not guilty and requested a PBI Hearing. Again, on February 13, 2020, he received a revised set of 75-18' disciplinary reports from his commanding officer and ordered to sign them. He again plead not guilty and requested a hearing.   Mr. Bowdren was never shown which specific Facebook posts were the basis of his alleged policy violations. (J.App.36, Amd. Compl. ¶¶ 264-265).

The vast majority of his Facebook posts consist of news articles.  The topics discussed in these articles all involved issues of public concern.

Det. Bowdren never received a hearing, and was forced to retire from the Department or forego his earned benefits. (J.Appx 36, Amd. Compl. ¶271).

### Plaintiff Raphael McGough

Raphael McGough began his employment as a commissioned police officer on April 14, 2003. Following the Mayor and Commissioner's press conference on

June 1, 2019, he learned that he was the subject of an investigation by the Philadelphia Police Internal Affairs Unit. In August of 2019, he was notified that he was facing a two-to-five-day suspension.  On November 29, 2019, he received a second set of charges alleging a violation for failure to comply with Police Commissioner's orders and issued a formal letter of reprimand.  (J.Appx. 36, Amd. Compl. ¶¶ 279-284).

All of Mr. McGough comments were about issues of public concern, such as the soaring murder rate in Baltimore, Maryland following the pull back of police presence in neighborhoods; news reports of Antifa extremists threatening to locate the homes of police officers; a November 19, 2017 news report of the execution of a man convicted of raping a 3-year-old girl; a September 7, 2017 news account of Philadelphia man shot in the face in front of his 2-year-old child. *Id*. at ¶ 286).

### Plaintiff Francis T. Sheridan

Francis T. Sheridan was employed   as a recruit police officer in September of 1990.   On January 27, 2020, he received notice of disciplinary action in addition to a reprimand, and was instructed that in order for the City to accept his plea of guilty, he would be required to waive any and all suits against the City of Philadelphia. He declined to accept these conditions or to sign the waivers, and was disciplined.

Mr. Sheridan does not identify himself as a police officer or employee of the City of Philadelphia on his Facebook page. The two Facebook comments for which he was disciplined pertain to the following issues of public concern, such as a news account of the conviction of a child rapist, and a September 18, 2016 news report of the release of a teenage child rapist suspect. (J.Appx. 36, Amd. Compl. ¶ 298).

### The Admitted Political Filter Used To Scrutinize Plaintiffs' Comments

On June 6, 2019, the Commanders within the City of Philadelphia Police Department held a meeting regarding the Buzzfeed article. During this public meeting First Deputy Commissioner Myron Patterson, stated that Injustice Watch was only going after what he termed "right wing posts". When another commander asked about left wing posts, Patterson replied: "I'm not worried about left wing posts, just the right wing. And God help you if I see any pro-life posts." (J.Appx. 36, Amd. Compl. ¶ 42).

This political bias in the enforcement of the defendant's social media Policy Directive 6.01 is borne out in the department's failure to sanction or discipline social media posts espousing more leftist-leaning comments. (J.Appx. 36, Amd. Compl._at ¶¶ 313-319).

### Lack of Opportunity To Conduct Discovery Regarding Allegation of Disruption Arising From The Social Media Posts of the Plaintiffs

The pivotal reason for the Court's decision to grant the Defendant's Rule 12 motion to dismiss is its finding that the Plaintiffs had failed to establish that their

free speech interests outweighed the Defendant's countervailing governmental interests, such as prevention of disruption within the department .[3] Central to the district court's ruling in this balancing analysis was its finding that the Plaintiffs' effectiveness and ability to perform their duties was negatively impacted when they were issued a "Giglio letter" from the District Attorney's office.[4] However, not all of the Plaintiffs were issued such letters. In fact, only three out of the twleve named plaintiffs were named in a Giglio letter from the District Attorney.[5]

More importantly, the Plaintiffs were never offered an opportunity to prove the absence of disruption – a key element of their burden as to the third prong of the Pickering balancing test. Instead, the court took as irrebuttable the claim by the

---

[3] "This Court finds that Plaintiffs have failed to establish a First Amendment retaliation claim. Although they spoke in their capacity as private citizens and some of their posts involve matters of public concern, Plaintiffs fail to show that their right to free speech outweighs the governments interest in regulating that speech." (J.Appx.25, Mem. Op).

[4] In *Giglio v. United States*, 405 U.S. 150 (1972), the Court held that prosecutors have a constitutional obligation to turn over evidence that can be used to impeach the credibility of a state's witness "[w]hen the 'reliability of [the] witness may well be determinative of guilt or innocence." A Giglio list is a list compiled by a prosecutor's office containing the names and details of law enforcement officers who have had sustained incidents of untruthfulness, criminal convictions, candor issues, or some other type of issue placing their credibility into question.

[5] The only named Plaintiffs alleged to have been placed on a Giglio list were Anthony Acquaviva . (J. Appx. 36, Amd. Complaint at ¶ 197); Thomas Bowdren . *Id*. at ¶ 268); and Raphael McGough, *Id*. at ¶ 285).

City that the *Giglio* dynamic was a sufficient factor to outweigh the Plaintiffs'

protected free speech interests.

## <u>SUMMARY OF THE ARGUMENT</u>

The district court committed legal error by failing to conduct the proper

balancing approach required under the first prong of the *Pickering-Connick* test, as

adopted by this Court in *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir.1996);

*Curinga v. City of Clairton*, 357 F.3d 305, 309 (3d Cir. 2004); and *Watters v. City*

*of Philadelphia*, 55 F.3d 886, 891 (3d Cir.1995).  Despite the lack of any evidence

of actual disruption or negative impact on working relationships within the

department, the district court, without any precedent in this federal circuit, applied

a "*per se* disruptive" standard to the Plaintiffs' speech, and finding the Plaintiffs'

speech presumptively unprotected.[6]  Plaintiffs were not afforded any opportunity

for even limited discovery to challenge the Defendant's bald assertion of disruption

within the department.

The district court found as a compelling interest outweighing the Plaintiffs'

constitutional exercise of their free speech rights, the City's interest in

"maintaining and preserving the public's trust and promoting a diverse workforce."

---

[6] *Pickering v. Bd. Of Educ. Of City Sch. Dist. Of City of New York,* 336 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

But there is no factual nexus anywhere in the record between the Plaintiffs' individual Facebook posts, most of which predate by several years the Buzzfeed article, and any impairment of these interests.

The district court may not make findings of fact and, insofar as there is a factual dispute, the court may not resolve it. See *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir.2011)(district court is not permitted to make independent findings of fact when deciding a Rule 12(b)(6) motion). *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175–76 (3d Cir. 2015). Here, there was a sharp factual dispute as to whether the Plaintiff's individual speech was disruptive. Rather than accepting the facts alleged in the complaint as true, the district court, in effect, made factual determinations stating that the speech was *"per se* disruptive." In doing so, it erred.

The important constitutional interests at stake in this case revolve around sharply disputed facts, and are deserving of consideration based on more than a record constructed merely of the pleadings themselves.  In virtually every reported case involving the application of the delicate balancing of factors required under *Pickering, Curinga, Watters and Baldassare* the court had the benefit of a developed factual record.[7] "[W]hen considering the protected status of [First

---

[7] *Baldassare v. State of N.J.*, 250 F.3d 188 (3rd Cir. 2001).

Amendment activity], an appellate court must ... make an independent

constitutional judgment <u>on the facts of the case</u>. *Id*. 55 F.3d at 899.

## <u>STANDARD OF REVIEW</u>

This case is before the Court on review of a motion to dismiss under Rule

12(b)(6). Such a motion tests the legal sufficiency of a claim. In reviewing a

motion to dismiss, the court must accept as true a complaint's factual allegations

and view them in the light most favorable to the plaintiff. See *Phillips v. Cty. of*

*Allegheny*, 515 F.3d 224, 228 (3d. Cir. 2008). This Court reviews a district court's

decision granting a motion to dismiss under a plenary standard. See *Evancho v.*

*Fisher*, 423 F.3d 347, 350 (3d Cir.2005). This means that a complaint's allegations

of historical fact "continue to enjoy a highly favorable standard of review at the

motion-to-dismiss stage of proceedings." *Id*., 515 F.3d at 231. Although a

reviewing court may "affirmatively disregard a pleading's legal conclusions, it

must still . . . assume all remaining factual allegations to be true, construe those

truths in the light most favorable to the plaintiff, and then draw all reasonable

inferences from them." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.

1 (3d Cir.2014). The primary question in deciding a motion to dismiss is not

whether the plaintiff will ultimately prevail, but rather whether he or she is entitled

to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221

F.3d 472, 482 (3d Cir.2000). Taking as true the allegations in the Plaintiffs'

Amended Complaint, these constitutional concerns survive this test and are worthy

of an opportunity to offer evidence in support of these claims.

## ARGUMENT

I.      **The Plaintiffs' Sufficiently Allege That Their Punishment Was Retaliatory And Based On Their Private Speech Regarding Matters of National Public Concern.**

A. The Plaintiffs' Speech Addressed Issues of Public Concern.

"If there is any fixed star in our constitutional constellation, it is that no

official, high or petty, can prescribe what shall be orthodox in politics, nationalism,

religion, or other matters of opinion or force citizens to confess by word or act

their faith therein." *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943)

(opinion of Robert H. Jackson, J.). "[S]peech on public issues occupies the highest

rung of the hierarchy of First Amendment values, and is entitled to special

protection." *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708

(1983).

"[S]peech on 'matters of public concern'…is 'at the heart of the First

Amendment's protection,'" *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*

472 U.S. 749, 758-759, 105 S.Ct.2939, 86 L.Ed 2d 593 (1985) (quoting *First Nat.*

*Bank of Boston v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed2d 707

(1978)). The First Amendment reflects "a profound national commitment to the

principle that debate on public issues should be uninhibited, robust, and wide-

open" *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed2d 868 (1964). In *Garrison v. Louisiana*, 379 U.S. 64, 74-75, 85 S.Ct. 209, 13 L.Ed2d 125(1964), the Court stated the justification for the special level of protection afforded such speech, and it is because "speech concerning public affairs is more than self-expression; it is the essence of self-government."

This Court has defined "public concern" as follows: "A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social or other concern to the community.' " *Green v. Philadelphia Housing Authority*, 105 F.3d 882, 885-86 (3ʳᵈ Cir.1997).

When a public employee challenges a governmental employer's disciplinary action arising out of their speech-related conduct, courts have relied on a two-step process in analyzing such claims. In *Pickering v. Board of Education*, 391 U.S. 563 (1968) The threshold issue is whether the employee was peaking as a private citizen on a matter of public concern. If so, then courts must inquire, based on the record as a whole, whether the government's interest in silencing the speech outweighs the speaker's liberty interest in communicating, *i.e.* whether the speech cause or reasonably threatened sufficient disruption in the workplace as to undermine the efficient provision of services to the public.

In *Connick v. Meyers*, 461 U.S. 138 (1983), the Supreme Court reaffirmed the *Pickering* balancing test and provided additional contours to what constitutes a

"matter of public concern" for purposes of the First Amendment.  In *Connick*, the

Court modified its holding in *Pickering* by clarifying what types of speech fall

within the ambit of matters of public concern. If a public employee's speech

"cannot be fairly considered as relating to any matter of political, social, or other

concern to the community," then it is not a matter of public concern, and

government officials should enjoy wide latitude in managing their offices. The

Court also provided factors for courts to consider when determining whether a

public employee is truly speaking about a matter of public concern: "Whether an

employee's speech addresses a matter of public concern must be determined [as a

question of law] by the content, form, and context of a given statement, as revealed

by the whole record." (Id. at 147-148).

　　　This Court has embraced the *Pickering* balancing analysis. "It is well-

established that '[p]ublic employees have a First Amendment right to speak freely

on matters of public concern.'" *Curinga v. City of Clairton*, 357 F.3d 305, 309 (3d

Cir. 2004); *Watters v. City of Philadelphia*, 55 F.3d 886, 891 (3d Cir.1995)

("judicial vigilance is required to ensure that public employers do not use their

authority to silence discourse on matters of public concern simply because they

disagree with the content of the employee's speech.").

　　　Where, as here, a public employee alleges a retaliation claim for engaging in

protected activity, there are three factors to consider. First, the employee must

demonstrate that the speech involves a matter of public concern and the employee's interest in the speech outweighs the government employer's countervailing interest in providing efficient and effective services to the public. *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996). This first point is conceded by the Defendant.

Secondly, the speech must have been a substantial or motivating factor in the alleged retaliatory action. *Baldassare v. New Jersey*, 250 F.3d 188, 194–95 (3d Cir.2001); *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir.1997). Finally, the employer can show that it would have taken the adverse action even if the employee had not engaged in protected conduct. *Pro,* 81 F.3d at 1288. The second and third factors are questions of fact, while the first factor is a question of law. *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3rd. Cir. 2004); *Johnson v. Lincoln Univ.*, 776 F.2d 443, 454 (3d Cir.1985) (holding "second and third questions ... should be submitted to the jury"); see also *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3rd Cir. 2001).

The foundation for this Court's application of the balancing test was earlier established in *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3rd Cir.1995), in which this Court held: "We analyze a public employee's claim of retaliation for engaging in protected activity under a three-step process. First, plaintiff must show that the activity in question was protected. *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993); *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir.1983).

As this Court has recognized, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Hill v. Borough of Kutztown*, 455 F.3d 225, 242 (3rd Cir.2006), citing *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) and quoting *Connick v. Myers*, 461 U.S. 138, 147–148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

In the instant case, the City concedes that the Plaintiffs spoke as private citizens and on matters of public concern. (JA-2, Mem. Op). The district court thus held that the Plaintiffs satisfied the first prong of the *Pickering* test, speaking on matters of public concern. *Id.* The district court further found that the Plaintiffs satisfied the second prong of the *Pickering* test, and spoke as private citizens. The court thus found that " . . . this case turns primarily on the City's ability to prove an adequate justification." (JA-26 Mem. Op. at fn. 20).

In virtually all of the reported cases in the Third Circuit involving claims of retaliation for public employee speech on issues of public concern, this Court had the benefit of a fully developed record, either through summary judgment or, in many cases, a jury trial. In the instant case, the district court sidestepped the need for any testimony or evidence, and decided the third prong of the *Pickering* balancing test based purely on Defendant's assertion that the *content* of the speech was "per se" disruptive. By pretermitting any need for a factual inquiry, the court

essentially ignored the factual analysis required under *Watters* and *Curinga* or their progeny.[8]

The failure of the district court below to conduct any factual analysis or balancing of evidence in the record is akin to the reversible error found by this Court in *Watters*. The district court in this case did not review or analyze any of these factors.

> The district court in this case did not review or analyze any of these factors. Instead, in its brief discussion of this side of the *Pickering* balance the court concluded that the speech was disruptive by focusing on Watters' use of the word "crisis" in the article and in his testimony.[8] However, the crisis to which Watters referred was one in the EAP, not one resulting from his speaking out.

*Watters*, 55 F.3d at 897.

Plaintiffs do not deny that the police department has an interest in maintaining and preserving the public's trust and promoting a diverse workforce, or maintaining orderly internal operations and avoiding disruption. However, the Defendant merely posited these interests without "proof" of how they were disrupted or minimized by any of the Plaintiff's specific exercise of the speech in question.

### B. The Plaintiffs' Speech Was A Substantial or Motivating Factor in the Alleged Retaliatory Action.

---

[8] *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3rd Cir. 2004) was reviewed under a summary judgment standard. In *Watters*, the court issued its ruling only after the benefit of a trial.

Whether the Plaintiffs' speech was a substantial or motivating factor in the decision to impose the disciplinary action taken in this case is a factual inquiry. By arguing that the speech was of no public interest or that it was of "low public interest" and was outweighed by the department's countervailing interest in requiring suppressing speech that is "*per se* disruptive", the City appears to concede, at least for purposes of this appeal, that the speech was a motivating factor in the Plaintiffs' terminations or suspensions. Still, these are questions which should not be resolved purely on the basis of the pleadings themselves. See *Johnson v. Lincoln University*, 776 F.2d 443, 454 (3d Cir.1985) ("second and third questions ... should be submitted to the jury"); see also *Zamboni v. Stamler*, 847 F.2d 73, 79 n. 6, 80 (3d Cir.) ("these inquiries [whether a substantial or motivating factor and whether same actions would have been taken regardless] ... are for the jury"), *cert. denied*, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988).

## II.    The District Court Erred In Applying A "*Per Se* Disruptive" Test.

The district court accepted without any supporting legal citation of authority the Defendant's argument that each and every one of the individual Plaintiffs' private comments on their social media were *per se* disruptive. The court also accepted, apparently as a factual basis without any evidence or proof, the Defendant's claim that its basis for this proposition, was the "increased national and local scrutiny and outcry against excessive force, police killings of unarmed

Black men, and…call to 'defund' the police[.]" (J.Appx. 27, Mem. Op.)  Adopting

such a standard of review places the degree of First Amendment protection to be

accorded any exercise of free speech on an arbitrary "sliding scale" tied to

whatever "national scrutiny and outcry" may be prevalent at the time.  The time-

honored constitutional rights at stake in this case should not be relegated to such an

arbitrary and temporal standard. "Defendant argues Plaintiffs' posts, which

advocated for extrajudicial violence, punishment, vigilantism, police abuse of force

and power, were *per se* disruptive because they celebrated harm to people at the

hands of the police."  (J.Appx 27, Mem. Op.).

There simply is no Third Circuit case which mentions or refers to a "*per se*

disruptive*" standard for evaluating public employee speech under the *Pickering*

balancing factors.

When conducting this inquiry under the *Pickering-Connick* test, the court

must examine "the content, form, and context of a given statement, as revealed by

the *whole record*." *Connick,* 461 U.S. at 147–48 (emphasis added). No one factor

is dispositive, and the court must take care to "evaluate all the circumstances of the

speech, including what was said, where it was said, and how it was said." *Snyder v.

Phelps*, 562 U.S. 443, 454 (U.S. 2011); *Miller v. Clinton Cty*., 544 F.3d 542, 550

(3d Cir.2008) ("We cannot 'cherry pick' something that may impact the public

while ignoring the manner and context in which that statement was made or that

public concern expressed."). In the instant case, no such searching factual inquiry was made.  Instead, the district court applied a type of subjective litmus test to determine that all of the comments were "*per se*" disruptive.

### A.  The District Court's Use of The "Giglio List" As A Factual Basis For Disruption Is Unsupported.

The primary basis of the Court's finding of *per se* disruption is the placement of the Plaintiffs on a Giglio list.  However, as stated in the Amended Complaint only three out of the twelve named plaintiffs were named in a Giglio letter from the District Attorney.

The decision of the District Attorney to issue a Giglio or "scarlet letter" to an officer's employer is entirely discretionary and without any opportunity for due process review.  As one commentator points out, there is increasing controversy over the arbitrary standard surrounding the issuance of such letters, and lack of due process for the affected officer.

> Over the last five decades, district attorneys across the country have read into the Giglio Doctrine a nonexistent obligation to publish sweepingly broad letters summarizing the reasoning behind Giglio impairment decisions, known as "Giglio letters," to officers' employers. Even though prosecutors only have a constitutional obligation to disclose impeachment material under Giglio when the reliability of a witness "may well be determinative of guilt or innocence," Giglio letters are almost always preemptive in nature, meaning they are sent in the absence of a pending trial. These preemptive Giglio letters inform an officer's employer of the state's refusal to call an officer as a witness at any future hypothetical trial, regardless of what the officer's role or testimony may be. These "preemptive" Giglio

determinations frequently lack legal and factual justifications as it is impossible for a prosecutor to determine whether he or she will have disclosure obligations in reference to a particular officer without knowing the context of their future testimony.

J. S. Warren, *The Scarlet Letter:  North Carolina, Giglio, and the Injury In Search of a Remedy*, 12 Wake Forest L. Rev. Online 24, 26–27 (February 28, 2022).

In addition, there is a growing concern that officers are being wrongfully targeted through the misuse of Giglio letters in an attempt to purposefully discredit their reputations.

Again, the district court did have any evidence before it that public perception of the Philadelphia Police Department had been negatively impacted by the mere release of the Buzzfeed article.  There is nothing in the record to show that individuals outside the department had called or emailed demanding that the Plaintiffs be fired or disciplined, or that any the department take action against any of those named in the Buzzfeed article.

III.    **The Plaintiffs Sufficiently Allege A Claim For Retaliation Based Their Exercise of Their First Amendment Protected Speech.**

In order to prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove that (1) he engaged in constitutionally protected conduct, (2) the defendant engaged in "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights," and (3) "a causal link [existed] between the constitutionally protected conduct and the

retaliatory action." *Baloga v. Pittston Area School District*, 927 F.3d 742, 752 (3rd

Cir. 2019), citing *Palardy v. Township of Millburn*, 906 F.3d 76, 80-81 (3rd Cir.

2018)(quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)). The first

element of the analysis requires a legal determination; the remaining steps present

questions for the fact finder. See *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d

Cir. 2001); see also *Watters v. City of Phila.*, 55 F.3d 886, 899 (3d Cir. 1995)

("[W]hen considering the protected status of [First Amendment activity], an

appellate court must ... make an independent constitutional judgment on the facts

of the case." (citations omitted)); *Suppan v. Dadonna*, 203 F.3d 228, 233–35 (3d

Cir. 2000) ("It is a question of fact whether the [allegedly adverse action] reached

the threshold of actionability under section 1983." (citation omitted)); *Zamboni v.

Stamler*, 847 F.2d 73, 79–80, 79 n.6, 80 (3d Cir. 1988) (noting that whether

protected activity was a motivating factor for an employer's adverse action and

whether the employer would have taken the action regardless are questions for the

jury).

      If, as in this case, a plaintiff satisfies these elements, the government may

avoid liability if it can show by a <u>preponderance of the evidence</u> that it would have

taken the adverse action "even in the absence of the protected conduct." *Miller v.

Clinton Cty.*, 544 F.3d 542, 548 (3d Cir. 2008) (quoting *Watters v. City of Phila.*,

55 F.3d 886, 892 (3d Cir. 1995)).

### A.  The Defendant Cannot Show That It Would Have Taken The Adverse Action Had Not The Plaintiffs Engaged In Protected Conduct.

There can be no genuine dispute in this case regarding the causal connection between the Plaintiffs' exercise of their First Amendment rights and their subsequent termination or suspension.  Indeed, it is all but admitted by the Defendant that "but for" the Plaintiffs' engaging in the private speech in question, they would never have been subjected to disciplinary action.  Prior to the events in question, not one of the Plaintiffs had ever been disciplined, and no other misconduct is even pretextually asserted as a basis for the their discipline.

### <u>CONCLUSION</u>

"[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967). This Court and others have recognized that "freedom of speech is not traded for an officer's badge." *Biggs v. Village of Dupo*, 892 F.2d 1298, 1303 (7th Cir.1990); see also *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1062 (3rd Cir. 1989).

Surely the bedrock constitutional rights at stake in this case deserve more than a cursory acceptance at face value of the Defendant's "*per se*" argument.  At a minimum, the balancing of the competing interests enunciated in *Pickering* demands that the Plaintiffs at least be afforded a reasonable opportunity to rebut

these bare assertions before passing judgment on the claims presented. Perhaps this is the reason virtually all of the reported cases involving an application of this delicate balancing criteria are decided on summary judgment or after trial.

"[W]hen considering the protected status of [First Amendment activity], an appellate court must ... make an independent constitutional judgment on the facts of the case. *Watters v. City of Phila.*, 55 F.3d 886, 899 (3d Cir. 1995). The only "facts" in this case which must be accepted as true for purposes of this appeal are those stated in the Plaintiffs' Amended Complaint. Plaintiffs respectfully request that this Court reverse and remand this case back to the district court to allow the Plaintiffs a reasonable opportunity through discovery to rebut the Defendant's unsupported assertions of disruption or interference.

Respectfully submitted,

CRAIN LAW GROUP, PLLC
By:
*/s Larry L. Crain*
Larry L. Crain (Tn. Bar # 09040)
5214 Maryland Way, Suite 402
Brentwood, TN 37027
Tel. 615-376-2600
Fax. 615-345-6009
Larry@crainlaw.legal

*/s Jonathan J. Sobel*
Jonathan J. Sobel (Pa. Bar # 76428)
Law Offices of Jonathan J. Sobel
1500 Walnut Street, Suite 2000
Philadelphia, PA 19102
Tel. (215) 735-7535

Fax: (215) 269-2540
Email: mate89@aol.com

*Counsel for the Plaintiffs*

## CERTIFICATION OF WORD COUNT

Undersigned Appellants' counsel hereby certifies pursuant to type-volume limitation requirement in Rule 32(a)(7)(B) Fed.R.Civ.P., that this opening appellants' brief (including headings and footnotes, but excluding the cover, table of contents, table of authorities, and certifications), consists of 6,958 words in Times Roman, 14 point size font, with no more than 650 lines of text.

Date:   June 6, 2022.                                    */s/ Larry L. Crain*
                                                          Larry L. Crain (Tn. Bar # 0940)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Brief of Appellants was served on the following individuals via the Court's ECF-Filing System and via U.S. Mail on this the 6th day of June, 2022:

Meghan Byrnes
City of Philadelphia Law Department
1515 Arch Street
17th Floor
Philadelphia, PA 19102

*Counsel for the Defendant*

                                         */s/ Larry L. Crain*
                                          Larry L. Crain