## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No. 22-1326

CHRISTIAN FENICO et al.,

Appellants,

V.

THE CITY OF PHILADELPHIA.

Appellee.

## BRIEF FOR APPELLEE
## CITY OF PHILADELPHIA

Appeal from the Order entered January 26, 2022 by the United States District Court for the Eastern District of Pennsylvania, Tucker, J., in Civ. No. 20-cv-3336, Granting the City of Philadelphia's Motion to Dismiss

CITY OF PHILADELPHIA LAW DEPARTMENT
DIANA P. CORTES, CITY SOLICITOR

By: Meghan Byrnes, Esq.
Deputy City Solicitor, Appeals Unit
I.D. No. 321316
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
(215) 683-5011
meghan.byrnes@phila.gov
*Attorney for Appellee City of Philadelphia*

Date: July 11, 2022

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. ii

**COUNTERSTATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION** ....................................................................................1

**COUNTERSTATEMENT OF THE ISSUES PRESENTED ON APPEAL** ......2

**COUNTERSTATEMENT OF THE STANDARD OF REVIEW** ......................3

**COUNTERSTATEMENT OF THE CASE** ...................................................5

   I.  Factual Summary ...........................................................................5

      A. The Plain View Project published online over 3,000 Facebook posts and comments of over 300 Philadelphia police officers, including 250 posts from the plaintiff Officers ...............................................................5

      B. Summary of each Officer's posts and disciplinary action. ...........................8

   II.  Procedural History ........................................................................29

**SUMMARY OF ARGUMENT** .........................................................................30

   I. The District Court correctly applied the *Pickering* balancing test as a matter of law to determine that the Officers' posts were not protected by the First Amendment. ..................................................................................33

      A. Legal framework for analyzing First Amendment free speech rights of public employees ...............................................................................34

      B. The District Court correctly determined that the Officers' interest in their biased and violent speech could not overcome the Police Department's interests in effective operations and maintaining public trust. ........................38

      C. The Officers' remaining arguments regarding the age of the posts, the Police Department's alleged political bias, and purported need for discovery to prove "absence of disruption" and resolve "sharply disputed facts" provide no plausible basis to overturn dismissal. ........................................................52

   II.  Even if some of the Officers' posts published by Plain View were protected, they cannot plausibly allege the second prong of the First Amendment retaliation analysis—that this allegedly protected speech was a substantial factor in the Police Department's disciplinary decisions. ........................................................57

**CONCLUSION** ...................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................3, 59

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................3

*City of San Diego, Cal. v. Roe*,
  543 U.S. 77 (2004)..............................................................................36

*Connick v. Myers*,
  461 U.S. 138 (1983)............................................................... 34, 37, 55

*Craig v. Rich Twp. High Sch. Dist. 227*,
  736 F.3d 1110 (7th Cir. 2013) ...................................................... 55, 56

*Eberhardt v. O'Malley*,
  17 F.3d 1023 (7th Cir. 1994) ...............................................................51

*Evancho v. Fisher*,
  423 F.3d 347 (3d Cir. 2005).................................................................3

*Fisher v. Mermaid Manor Home for Adults*,
  192 F. Supp. 3d 323 (E.D.N.Y. 2016) .................................................42

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)............................................................... 34, 35, 36

*Garza v. Escobar*,
  972 F.3d 721 (5th Cir. 2020) ...............................................................56

*Grutzmacher v. Howard Cty.*,
  851 F.3d 332 (4th Cir. 2017) ......................................................... 45, 51

*Henry v. Johnson*,
  950 F.3d 1005 (8th Cir. 2020) ...............................................................44

*Hill v. Borough of Kutztown*,
  455 F.3d 225 (3d Cir. 2006).................................................... 33, 35, 58

*Jefferson v. Ambroz*,
  90 F.3d 1291 (7th Cir. 1996) ...............................................................56

*Kelley v. Johnson*,
  425 U.S. 238 (1976)..............................................................................34

*Kost v. Kozakiewicz*,
  1 F.3d 176 (3d Cir. 1993)......................................................................30

*Lane v. Franks*,
  573 U.S. 228 (2014)..............................................................................43

*Larsen v. Senate Com. of Pa.*,
  154 F.3d 82 (3d Cir. 1998)....................................................................60

*Lloyd v. Holder*,
  No. 11 Civ. 3154, 2013 WL 6667531 (S.D.N.Y. Dec. 17, 2013) ............... 40, 42

*Locurto v. Giuliani*,
  447 F.3d 159 (2d Cir. 2006)........................................... 40, 41, 42, 43, 53, 54, 55

*Lytle v. City of Haysville, Kan.*,
  138 F.3d 857 (10th Cir. 1998) .............................................................41

*Morse v. Lower Merion Sch. Dist.*,
  132 F.3d 902 (3d Cir. 1997)....................................................................3

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977).......................................................................... 58, 59

*Munroe v. Cent. Bucks Sch. Dist.*,
  805 F.3d 454 (3d Cir. 2015), *as amended* .................................... *passim*

*Muti v. Schmidt,*
    118 F. App'x 646 (3d Cir. 2004) .................................................................. 56, 60

*Oladeinde v. City of Birmingham,*
    230 F.3d 1275 (11th Cir. 2000) ..........................................................................35

*Pace v. Baker-White,*
    850 F. App'x 827 (3d Cir. 2021) ..........................................................................5

*Palardy v. Twp. of Millburn,*
    906 F.3d 76 (3d Cir. 2018)...................................................................................34

*Pappas v. Giuliani,*
    290 F.3d 143 (2d Cir. 2002)......................................................... 39, 40, 41, 42

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.,*
    712 F.3d 705 (2d Cir. 2013)................................................................................60

*Phillips v. Cty. of Allegheny,*
    515 F.3d 224 (3d Cir. 2008)..................................................................................3

*Pickering v. Board of Education of Township High School, District 205, Will
    County, Illinois,*
    391 U.S. 563 (1968) ....................................................................................... passim

*Pinker v. Roche Holdings, Ltd.,*
    292 F.3d 361 (3d Cir. 2002)..................................................................................4

*Rankin v. McPherson,*
    483 U.S. 378 (1987) .................................................................................... 36, 37

*Spence v. Bukofzer,*
    No. 15 Civ. 6167, 2017 WL 1194478 (S.D.N.Y. March 30, 2017) ....................42

*Tri-M Grp., LLC v. Sharp,*
    638 F.3d 406 (3d Cir. 2011)................................................................................54

*Venable v. Metro. Gov't of Nashville,*
    430 F. Supp. 3d 350 (M.D. Tenn. 2019).............................................................46

*Waters v. Churchill*,
   511 U.S. 661 (1994)...................................................................................34

*Watters v. City of Phila.*,
   55 F.3d 886 (3d Cir. 1995)........................................................................34

**Statutes**

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

**Rules**

Fed. R. App. P. 28(a)(3)..............................................................................30

Fed. R. Civ. P. 12(b)(6)................................................................................3

**COUNTERSTATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION**

This is an appeal from the District Court's January 26, 2022 Order granting the defendant City of Philadelphia's motion to dismiss against plaintiffs Christian Fenico, Thomas Young, Thomas Gack, Edward McCammitt, Tanya Grandizio, Anthony Anzideo, Anthony Acquaviva, William Bowdren, Joseph Przepiorka, Kristine Amato, Raphael McGough, and Francis Sheridan (the "Officers"). The Officers filed a timely appeal to this Court on February 23, 2022. Joint Appendix (3d Cir. ECF No. 15) at pp. 2-3, 103 (cited as "JAppx[p. #]" herein). The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED ON APPEAL

1.      Did the District Court properly dismiss Philadelphia police officers' First Amendment retaliation claims where it found that: (1) the Police Department's operational and public safety interests prevailed over the free speech interests that the officers had in their racist, Islamophobic, anti-LGBTQ and violent Facebook posts; and (2) it is not plausible that any of the officers' Facebook posts that were arguably protected speech played a substantial role in the Police Department's disciplinary decisions?

Suggested Answer: Yes

## COUNTERSTATEMENT OF THE STANDARD OF REVIEW

This Court reviews a district court's decision granting a motion to dismiss under a plenary standard. *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). The applicable standard for a district court reviewing a Rule 12(b)(6) motion is well settled. Under this rule, the court must dismiss an action on motion before a responsive pleading is filed, when a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To plead a viable cause of action, the allegations must transcend the "speculative" and "conceivable," and must include "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007). The court must disregard "legal conclusions" and "conclusory statements," and must scrutinize the well-pleaded factual allegations to ensure that they are more than "merely consistent with a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (disregarding "bald assertions" and "legal conclusions" in motion to dismiss). When evaluating a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiff's complaint and must view any reasonable inferences that may be drawn therefrom in the light most favorable to plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231-33 (3d Cir. 2008). Finally, the court must "determine whether, under any reasonable reading

3

of the complaint, the plaintiff may be entitled to relief." *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002).

# COUNTERSTATEMENT OF THE CASE

This appeal arises from the District Court's dismissal of the First Amendment retaliation claims brought by plaintiffs (the "Officers"), who comprise twelve current and former police officers of the Philadelphia Police Department (the "Police Department" or "Department"). The Police Department disciplined or terminated the Officers for posting racist, Islamophobic, and otherwise violent commentary on the social media website Facebook.

## I.    Factual Summary

### A. The Plain View Project published online over 3,000 Facebook posts and comments of over 300 Philadelphia police officers, including 250 posts from the plaintiff Officers.

In 2019, a non-profit news organization called The Plain View Project (also referred to herein as "Plain View") published an online database[1] identifying thousands of Facebook posts and comments by current and former police officers across several U.S. cities, including Philadelphia.[2] JAppx36-37 (Am. Compl. ¶ 2). The posts that Plain View chose to publish reflected views "about race, religion,

---

[1] *See* City's Mot. to Dismiss (Dist. Ct. Dkt., Case No. 2:20-cv-03336-PPT, ECF No. 18 at 11); *see also* Complete Collection, THE PLAIN VIEW PROJECT, *available at* https://www.plainviewproject.org (last visited June 23, 2022).

[2] *See also Pace v. Baker-White*, 850 F. App'x 827 (3d Cir. 2021) (nonprecedential) (describing the Plain View Project). The *Pace* case involved a defamation lawsuit brought by a Philadelphia Police Inspector against the creators of the Plain View database. *Id.* at 833. This Court affirmed the District Court's dismissal of that suit. *Id.*

ethnicity, and the acceptability of violent policing" that Plain View believed "could undermine public trust and confidence in our police." Home, THE PLAIN VIEW PROJECT, *available at* https://www.plainviewproject.org/ (last visited June 23, 2022); *see also* JAppx6 (Dist. Ct. Op. at 2). Out of the over 5,000 posts in the database, approximately 3,000 came from over 300 different Philadelphia police officers. *Id.* The twelve Officers in this case published over 250 of these posts. *See* Supplemental Appendix (3d Cir. ECF No. 24) at 24-269 (hereinafter cited as "SAppx[p. #]").[3]

Several media outlets reported on the posts disclosed by the Plain View Project. The most comprehensive exposé was a Buzzfeed News article[4] that highlighted the concerns raised by scholars and community leaders caused by the posts and comments (the "Buzzfeed Article"). SAppx1-17.

---

[3] These posts appeared in appendices filed alongside both the Original and Amended Complaints in this case, but the Joint Appendix does not contain them. The City has moved to file a Supplemental Appendix that contains all of the Officers' Facebook posts that were part of appendices to the Complaints. *See* Appellee's Mot. for Leave to File Supplemental Appendix (3d Cir. ECF No. 23); *see also* JAppx102 (Dist. Ct. ECF No. 19).

[4] *See also* JAppx36 (Am. Compl. ¶ 1) (referencing Emily Hoerner & Rick Tulsky, *Cops Across the US Have Been Exposed Posting Racist and Violent Things on Facebook. Here's the Proof.* BUZZFEED NEWS, June 1, 2019, *available at* https://www.buzzfeednews.com/article/emilyhoerner/police-facebook-racist-violent-posts-comments-philadelphia (last visited June 23, 2022).

Upon discovery of the Buzzfeed Article and of the Plain View database, the Police Department investigated each of the Officers' individual posts published by Plain View, concluding that the Officers violated either or both of the following sections of the Police Department's Disciplinary Code:

- Article I – Conduct Unbecoming – Section 1-§ 021-10, which allows for discipline based on "[a]ny incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department.

- Article V – Neglect of Duty – Section 5-§ 011-10, which allows for discipline based on "[f]ailure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors.

JAppx45 (Am. Compl. ¶¶ 56-57). These Facebook posts also violated the Police Department's Social Media Policy, Directive 6.10, which prohibits the use of ethnic slurs, personal insults, material that is harassing, profanity, personal insults, material that is harassing, defamatory, fraudulent, or content that would otherwise not be acceptable in a City workplace.[5] JAppx90-95.

---

[5] The Policy specifically states: "[A]s members of the Philadelphia Police Department, employees are embodiments of its mission. It is, thus, essential that each member accept his or her role as an ambassador of the department.  In doing so, *each member must strive to maintain public trust and confidence*, not only in his or her professional capacity, *but also in his or her personal and on-line activities*. Moreover, as police personnel are necessarily held to a higher standard than general members of the public, the on-line activities of employees of the police department shall reflect such professional expectations and standards. JAppx90-91 (emphasis added).

In addition to the above, the Officers were also bound by the Police Department's Oath of Office ("Oath") and Code of Ethics,[6] pursuant to which each of them swore to uphold the law "without consideration to a person's race, color, sex, gender identity, religious creed, sexual orientation, age, national origin, ancestry, handicap or disability[.]" SAppx18-21.

### B. Summary of each Officer's posts and disciplinary action.

In spite of these provisions, the Officers published posts that contained discriminatory and violent commentary. Now, each allege that the Police Department improperly singled them out based on their "political" views, and request $2 million each in damages. JAppx38 (Am. Compl. ¶ 7). Below is a summary of each Officer's posts that appeared in the Plain View database and a description of the discipline they received.

### 1. Joseph Prezpiorka

Joseph Przepiorka was a police officer from approximately 1989 until his retirement in lieu of termination on or around August 6, 2019. JAppx69, 71-72 (Am. Compl. ¶¶ 227, 241, 248). Out of the nearly 100 posts attributed to him and flagged

---

[6] Similar to the Oath, the Code of Ethics provides that all officers shall, *inter alia*, "respect the Constitutional rights of all persons to liberty, equality, and justice," "keep [their] private li[ves] unsullied as an example to all," to never "permit personal feelings, prejudices, animosities, or friendships to influence [their] decisions" and to "recognize the badge[s] of [their] offices as *a symbol of public faith, and [] accept it as a public trust to be held*[.]" SAppx20-21 (emphasis added).

by the Plain View Project, at least 41 of them contain discriminatory and violent content. For example, Mr. Przepiorka posted the following that is both Anti-Muslim and violent:



SAppx130. Similarly, he posted a meme[7] of General "Mad Dog" Mattis captioned with "Fired by Obama to please the Muslims, Hired by Trump to exterminate them."

---

[7] A meme is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially though use of social media. *Meme*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/meme.

SAppx192.[8] His posts also theorize that all terrorism is caused by Muslims. For instance, he posted the following meme:



---

[8] Mr. Przepiorka's other anti-Muslim posts include (but are not limited to): SAppx185 ("The Path of Islam is always the same: 1. Establish a Mosque 2. Create an enclave 3. Grow the population 4. Claim Victimhood 5. Resist Host Authorities & Customs 6. Exploit Lawfare 7. Institute Shariah 8. Secede 9. Take Control."); SAppx205 ("All of Europe and America need to unite and send these people back to their country or hell."); SAppx221 (sharing a post about DHS granting amnesty to Syrian refugees and commenting that they can fit at the "bottom of my pool"); SAppx130 ("They [Muslims] suck the Western welfare systems dry, outbreed to become a majority, lobby for their own laws and takeover [sic]. Like and share if you are sick of it."); SAppx140 ("Islam is not a religion it is a cult that glorifies death."); SAppx201 ("You see refugees? I see invaders.").

SAppx169.[9]

Mr. Przepiorka's ire is not directly solely at Muslims. Numerous posts ridicule or otherwise demonstrate prejudice against African-Americans, Mexicans, and transgender individuals. For example, Mr. Przepiorka also posted the following meme, ridiculing and threatening violence against transgender people:



_____

[9] SAppx205 ("I learned everything I needed to Know About Islam on 9/11."); SAppx160 (meme that "Not all religions are the same," intimating that terrorist attacks are committed only by Muslims); SAppx206 (meme listing "terrorist's religion" as Muslim for recent U.S. and European mass shootings, with caption "See a pattern here?").

SAppx142.[10]

Mr. Przepiorka also promoted violence against protestors and vigilante justice. For example, he posted the following meme suggesting that protestors should get run over:



---

SAppx146.

## 2. Edward McCammitt

Edward McCammitt was a police officer from around 1986 until he retired in lieu of termination on or around July, 23, 2019. JAppx53, 57 (Am. Compl. ¶¶ 110, 131). Most prevalent are his posts that make light of violence, excessive use of force, and police misconduct. In particular, Mr. McCammitt posted a meme of a human silhouette shooting target with the caption "Why don't they shoot them in the leg? Because you're an idiot…and its only 2 points."



SAppx75.  In this post, he promoted police violence against protestors:



SAppx68. Similarly, he posted a meme of a vehicle's front bumper with the caption "This bumper will take an animal hit at 65 mph[.] Or a protestor, whatever." SAppx69.[11] Mr. McCammitt's posts also display bias against Muslims and LGBTQ individuals.[12] For example, Mr. McCammitt posted the following meme stereotyping all Muslim men as pedophiles:

---

[11] *See also* SAppx69 (suggesting that protestors should be hit by trains); SAppx81 (suggesting that protestors are "speed bumps").

[12] *See, e.g.*, SAppx70 ("Muslims: Death to America![;] American Liberals: Let them in!); SAppx83 ("Knock Knock, We're Your New NEIGHBORS"); SAppx76 ("When you get shot in the groin by a rubber bullet and your made-up gender doesn't protect your willie.").



SAppx82.

### 3. Anthony Acquaviva

Anthony Acquaviva served as a police officer from approximately 1990 until he retired in lieu of termination on or around July 19, 2019. JAppx64, 66 (Am. Compl. ¶¶ 187, 201). Mr. Acquaviva disparaged African-Americans and Muslims in a number of Facebook posts. For example, Mr. Acquaviva lampooned Muslim garb by posting meme of a Muslim woman and child dressed in black burqas standing next to trash bags, which stated: "I saw her standing there and I told her that she had three beautiful children. She didn't have to get all pissed off and threaten me. It was an honest mistake." SAppx105. Mr. Acquaviva also posted a meme of what appears

to be a Muslim man saying "All I want to do is move to your country, rape your women, bomb your buses, riot in your streets, and demand that you accept my religion. Why can't you be more tolerant?" SAppx104. Mr. Acquaviva also ridiculed and demeaned Black persons by sharing a meme of a Black man wearing what appears to be a diaper under his jeans. The picture is captioned with the word "Thuggies™," indicating a play on words between the derogatory term "Thug" and the "Huggies" diaper brand:[13]



SAppx113.

_____

[13] Mr. Gack also posted this meme. SAppx48.

Mr. Acquaviva also posted the following meme, juxtaposing the Confederate flag being pulled down from a pole against a photo of Black males wearing low pants with their boxers exposed. The caption of the meme states "Punks on parade. Profiling makes sense."



SAppx100.[14]

Before his retirement, the District Attorney's Office informed Mr. Acquaviva that he would be placed on a "Giglio" list, which would bar him from testifying in criminal prosecutions because the content of his Facebook posts would impugn his credibility as a witness. JAppx65 (Am. Compl. ¶ 197); Officer Br. (3d Cir. ECF No. 14) at 15 n.5.

### 4. Thomas Gack

Thomas Gack was a police officer from 1993 until his termination in or around August 2019. JAppx50, 52 (Am. Compl. ¶¶ 89, 103-04). Mr. Gack published posts demonstrating racial and ethnic animus, as well as anti-Muslim sentiment. For example, he posted the following meme depicting four chimpanzees with their hands outstretched, labelling them "Obama Voters":

---

[14] Mr. Acquaviva authored other anti-Muslim posts. *See, e.g.*, SAppx106 (meme of two women in burqas with the caption "This has no place on American soil."); SAppx107 (meme comparing Muslims to Nazis, stating "It's said only 5-10% of Muslims are extremists [sic]. In 1940 only 7% of Germans were Nazis, how'd that go?").



SAppx56.[15]

Mr. Gack also posted a smattering of violent content that, among other things,

promoted police violence against protestors and transgender individuals and called

---

[15] *See also, e.g.*, SAppx43 (referring to African-American politicians as "thugs" and "race baiters"); SAppx51 (meme stereotyping Mexican in a sombrero with the comment "Hillary Clinton sucks"); SAppx38 (commenting on an article about the Pope washing Muslim prisoners' feet: "This is what socialists do……pander to the evil that wants to kill you!!!"); SAppx30 (posted a video titled "Muslims Say They Will Make Rape Legal On White Women When They Take Over Europe!!!"); SAppx52 (commenting on news that "Islamic refugees" would be allowed into Pennsylvania, calling them "terrorists"); SAppx37 (posting a meme of a woman in a bikini leaning against a pig, stating "Happy Ramadan!").

for the extrajudicial execution of child molesters.[16] For example, he also posted a meme indicating that if someone "belongs" in a men's bathroom and follows his wife or daughter into a women's bathroom, that person will need to use the "handicapped" restroom. SAppx50.

### 5. Thomas Young

Thomas Young served as a police officer from 1990 to 2019, reaching the rank of Corporal, until approximately July 19, 2019 when he resigned in lieu of termination. JAppx48, 50 (Am. Compl. ¶¶ 71, 83). As noted by the District Court, many of Mr. Young's posts were Islamophobic and warned of a religious takeover by Muslims in the United States. JAppx14 (Dist. Ct. Op. at 10). For example, on the following post, he commented "Ban Islam from all Western Nations":

---

[16] *See* SAppx44 (meme of solider dragging an individual in handcuffs around the neck that stated "How to Handle Protestors Who Block Traffic and Vandalize"); SAppx66 (accused child sex offender should be "beaten to death by the families of his victims"); SAppx40 (meme referring to "Child Molester Hunting Permit" and promoting shooting child molesters "on sight").



SAppx257.[17]

Mr. Young's posts also support police brutality. For example, in two separate

---

[17] *See also* SAppx253 (commenting "Ban Islam from our country" to a post regarding "Somali Terrorists" entering the United States); SAppx246 ("I hope the people of the West wake up to this Islamic Invasion before its [sic] too late!"); SAppx249 (in response to mass shooting in San Bernadino, sarcastically commenting "That pesky religion of Peace always up to something); SAppx255 ("Ah, where ever [sic] Islam goes it brings peace and happiness. NOT!!").

posts, Mr. Young (1) voiced his support for the Italian Police 'having no mercy' as they intervened in a protest; and (2) commented "don't resist arrest" on a post about officers breaking a man's leg after a traffic stop. JAppx14 (Dist. Ct. Op. at 10); SAppx248; SAppx245.[18]

### 6. Christian Fenico

Christian Fenico served as a police officer from 2003 until his termination on or about July 17, 2019 based upon the posts he published using the name "Chris Joseph." JAppx41-42, 44-45 (Am. Compl. ¶¶ 26, 33, 49, 54-55). For example, he commented the following on a post about Muslim refugees refusing food donations, with the caption "STOP ISLAM": "Good, let them starve to death. I hate every last one of them." SAppx29. Mr. Fenico demonstrated racial bias in several posts, including one comment about a teen who was shot: "I like the 'why is there no epidemic of white cops shooting white kids.' Ummm." SAppx28.[19] He also

---

[18] Mr. Young also demonstrated anti-LGBTQ sentiment. *See* SAppx252 (in reference to an article entitled "Homosexuals Throw Human Excrement At Christians and Wipe Their Anuses With Pages of the Bible," he identified himself as a police officer who has "had the misfortune to detailed [sic] to events like this" and also commented "Liberalism is truly a mental disorder.").

[19] *See also* SAppx25 (advocating violence in a post about allegedly racist speech by actor Jaime Foxx, saying that "white people" should have "kicked his ass"); SAppx25 (criticizing the "department" for hiring a "rap thug"). Mr. Fenico also commented the following in reference to an article about teenagers assaulting individuals called the "Knockout Game": "You'd think after the Zimmerman incident people would learn." SAppx27. This was an obvious reference to the 2012 homicide of Black teenager Trayvon Martin by George Zimmerman.

demonstrated a troubling attitude towards use of force. For example, in sharing an article about a teenager injured by police, he commented: "Who cares, kid and mom are scumbags. Good job police." SAppx27.

### 7. Tanya Grandizio

Tanya Grandizio[20] has been employed with the Police Department since approximately 1995, reaching the status of Corporal. JAppx58 (Am. Compl. ¶¶ 138, 140). Corporal Grandizio received a 30-day suspension based on her Facebook posts, which demonstrated anti-Muslim sentiment. JAppx59 (Am. Compl. ¶ 150). For example, she posted a long meme that lists ten "reasons" why Muslims cannot be "good American[s]" based on their religion. SAppx91. Further, she commented that "…perhaps we should be very suspicious of ALL MUSLIMS in this country...They obviously cannot be both 'good' Muslims and good Americans…The religious war is bigger than we know….Muslims everywhere have said they will destroy us from within." *Id.* (emphasis original). Similarly, another meme she shared stated "Muslims hate pork, beer, dogs, bikinis, Jesus, and freedom of speech." SAppx93.[21]

---

[20] The Amended Complaint appears to misspell Corporal Grandizio's name as "Grandizo." JAppx36. Her Facebook posts indicate that the correct spelling is "Grandizio."

[21] *See also* SAppx87 (meme with images of three different types religious leaders (representing Judaism, Christianity, and Hinduism) saying "Leave us Alone, We Leave You Alone" without a fourth image of a leader representing Islam saying

### 8. Anthony Anzideo

Anthony Anzideo began his employment as a police officer in February 2007, and was eventually promoted to detective. JAppx59 (Am. Compl. ¶¶ 153, 155). In June 2019, the Police Department notified Detective Anzideo that he was under investigation for problematic posts on Facebook and would be placed on restricted duty for sixty days during the investigation. JAppx60-62 (*Id.* ¶¶ 163, 169, 179). After being returned to active duty, the Police Department served him charging paperwork recommending that he be suspended for five days without pay, a recommendation he challenged before the Police Board of Inquiry. JAppx62-63 (Am. Compl. ¶¶ 172, 175, 177).

Detective Anzideo's posts celebrated violence, and in particular, vigilante justice against those accused of crimes. For example, he stated "good point" in a post when someone commented 'throw him in general population and hopefully gets killed by an inmate" in reference to one of the Boston Marathon bombers. SAppx99. In a comment about shooter, Detective Anzideo wrote "POS [piece of s—t] …take him out." SAppx98. Further, Detective Anzideo posted an article about the "Knockout Game" and commented "Haha!" in reply to a friend saying that he "[h]ope[s] one of these kids get [sic] shot in the face." SAppx96.

---

"Leave us Alone, We'll Kill You Anyway."); SAppx89 (commented on meme titled "Can You Connect the Dots" that "Islam has been perverted and not many followers of Islam are trying to fix it").

### 9. Kristine Amato

Kristine Amato has been a police officer since 1990. JAppx67 (Am. Compl. ¶ 205). In September 2019, following an investigation of her Facebook posts, the Police Department issued her a 30-day suspension without pay. JAppx68 (*Id.* ¶¶ 215-18).

Officer Amato's posts primarily promote extrajudicial violence. For example, she commented on a news story where a police officer ran over an armed suspect, "Awesome. I hope the wheel went over her scumbag ass." SAppx126. Similarly, Officer Amato commented on a video depicting people demonstrating outside of the house of a Philadelphia police officer charged with murder. SAppx120-21. Apparently outraged at the demonstration, Officer Amato said "the neighborhood should've come out to face those savages" and later followed it with "WE NEED TO START FIGHTING BACK SOON!!!!!!!" *Id.* This post calls for violence against lawful assembly, and for police and neighbors to "fight back" against the demonstrators. Officer Amato also demonstrated anti-Muslim bias: in response to the same video posted about Muslim refugees refusing food donations as Mr. Fenico, she angrily commented to "send those ungrateful f----s back." SAppx117.

### 10. Francis Sheridan

Francis Sheridan has been a police officer since 1991. JAppx79 (Am. Compl. ¶ 288). Officer Sheridan received disciplinary charges on or around January 27, 2020. JAppx80 (*Id.* ¶ 295). At the time of the Amended Complaint, he had not yet received discipline related to these charges. JAppx80 (*Id.* ¶¶ 295-97). Officer Sheridan had two posts in the Plain View database; one of them explicitly promoting prison rape. In that post, he commented "thank God for prison justice!" in reference to a picture of what appears to be an inmate accused of a sex crime facing a wall with soiled pants and a wounded back:



SAppx268.

### 11. William Bowdren

William Bowdren started with the Police Department in 1996, eventually reaching the rank of detective. JAppx73-74 (Am. Compl. ¶¶ 257, 259). On June 9, 2019, he was temporarily assigned to restricted desk duty because of his Facebook posts. JAppx74-75 (*Id.* ¶¶ 264-65). Detective Bowdren subsequently returned to full active duty and was placed into a regular rotation with line squad detectives. JAppx75 (*Id.* ¶ 267). The Police Department later served him with disciplinary charges but, at the time of the filing of the Amended Complaint, he had not been formally suspended or terminated related to his Facebook posts. JAppx75-76 (*Id.* ¶¶ 268-72). He posted the following, supporting running over protestors:



SAppx232. In addition, Detective Bowdren referred to Black protesters as "savages," SAppx233, and also shared a post of a story where a WWII Veteran was murdered by "Black Thugs." SAppx234.[22] The District Attorney's Office also placed Mr. Bowdren on a "Giglio" list to prevent him from testifying in future criminal prosecutions. JAppx75 (Am. Compl. ¶ 268); Officer Br. at 5 n.5.

### 12. Raphael McGough

Raphael McGough began as a police officer in 2003, and is currently a Detective. JAppx77 (Am. Compl. ¶¶ 273, 276). On or around August of 2019, Detective McGough received disciplinary charges for his Facebook posts, facing a two-to-five-day suspension. JAppx78 (*Id*. ¶ 281). On December 12, 2019, the Police Department issued him a letter of reprimand. JAppx78 (*Id*. ¶ 284). One of Detective McGough's posts—he went by "Ray" on Facebook—called for the "elimination" of "alt-left extremists." SAppx260. Further, in a post promoting violence against citizens and promoting police cover-ups between the plaintiff Officers, Detective McGough responded to a meme shared by Mr. Acquaviva. Where Mr. Acquaviva stated "it should be legal to punch a civilian who spits on a man in uniform,"

---

[22] Officer Bowdren also displayed anti-Muslim animus and demonstrated a lack of respect for an individual's due process rights. SAppx236 (post of a presumably Muslim man with two young girls wearing a burqa captioned "Those aren't his daughter [sic]—those are his wives—welcome to Islam."); SAppx241 (responding "[t]hese 4 people need to be exterminated immediately" to article describing people charged with causing injuries to a 10-year-old girl).

Detective McGough commented that it is "legal" to punch said civilian "depending on who's writing the complaint." SAppx102. Along with Mr. Acquviva and Officer Bowdren, the District Attorney's Office also placed Detective McGough on a "Giglio" list. JAppx75 (Am. Compl. ¶ 285); Officer Br. at 5 n.5.

## II. Procedural History

The Officers initiated this suit on July 8, 2019 in the District Court. JAppx100. On October 7, 2020, the Officers filed an Amended Complaint, which is the operative pleading in this case. JAppx101. The Amended Complaint alleged that the Officers' discipline violated the First Amendment to the United States Constitution, Article I, § 7 of the Pennsylvania Constitution, and the Due Process Clause of the Fourteenth Amendment. JAppx36-89. On November 2, 2020, the City filed a Motion to Dismiss. JAppx102. On January 26, 2022, the District Court granted the Motion to Dismiss and issued its opinion in support thereof. JAppx4, 5-35, 103. On February 23, 2022, the Officers filed a notice of appeal. JAppx103.

The District Court carefully examined each of the Officers' posts, determining that the Officers' game of "racist bingo" was fundamentally at odds with their core duties and the realities of policing, where they "must continuously deal with individuals from multiple walks of life, regardless of their race, creed, sex, and religion." JAppx31 (Dist. Ct. Op. at 27). The District Court observed that the Officers "betrayed hard earned public trust" and that the disruptive nature of their

racist and violent speech merited less First Amendment protection when assessed against the public's reaction and the Police Department's operational interests. JAppx9, 29-30 (Dist. Ct. Op. at 5 n. 5, 25-26). As such, it held that the Officers' speech was not protected JAppx25 (Dist. Ct. Op. at 21). [23]

## SUMMARY OF ARGUMENT

While the Officers observe that many First Amendment retaliation cases concerning employee discipline are difficult to resolve at the Motion to Dismiss stage, the District Court correctly recognized that resolution was possible here. The Officers indisputably authored this set of outrageously hateful, racist, and violence-promoting posts; there is no dispute the posts were heavily publicized; and the Officers cannot seriously question that the existence and public knowledge of these posts would severely disrupt the Department's operations within its diverse workforce and the community at large. Therefore, the Department's decision to impose discipline for these posts was appropriate as a matter of law.

---

[23] In their Amended Complaint, the Officers brought additional claims for: (1) free speech under Article I, § 7 of the Pennsylvania Constitution and (2) due process under the Fourteenth Amendment to the United States Constitution. JAppx81-82. The District Court dismissed both of these claims. JAppx32-35 (Dist. Ct. Op. at 28-31). The Officers did not raise or address these claims on appeal. Accordingly, the Officers abandoned them and they need not be addressed by this Court. *See* Fed. R. App. P. 28(a)(3),(5); 3d Cir. L.A.R. 28.1(a); *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

The Officers failed to satisfy either element of a First Amendment retaliation claim. First, in applying the familiar *Pickering* balancing analysis—which is a question of law—the District Court correctly found that the Officers' posts were not protected speech. Considering their relatively weak interest in their inflammatory posts, the Officers cannot plausibly allege their free speech interests outweighed the Police Department's operational interest in avoiding the disruption that their posts were likely to (and did) cause.  It is obvious that police officers who harbor animus toward Black persons, Muslims, and LGBTQ individuals, and who also advocate for and celebrate illegal use of force, cannot credibly serve and protect a diverse citizenry. Nor can the Officers credibly argue that these posts would not disrupt their working relationships with fellow officers who hail from different backgrounds. Additionally, the Officers' Facebook posts could disrupt criminal prosecutions in which the officers were witnesses.  Indeed, as the District Court noted, these posts have already resulted in actual disruption for at least three Officers who are now effectively barred from testifying as witnesses in criminal prosecutions.

While the Officers are correct that the second element—whether the protected speech was a substantial factor in an employee's discipline—is typically a question of fact resolved after discovery, they ignore that in this case, the allegations themselves comprise a developed record of the over 250 Facebook posts they authored. At bottom, given the extremely offensive and harmful nature of the vast

31

majority of these posts, it is not plausible for the Officers to suggest that any potentially protected posts (which the Officers do not attempt to identify) might have actually played a significant role in the Department's decision to discipline them. Accordingly, the District Court did not err in dismissing their First Amendment retaliation claims wholesale.

## ARGUMENT

As the District Court observed, the Officers' posts at issue in this case "betrayed hard earned public trust." JAppx9 (Dist. Ct. Op. 5, n.5). The Police Department was entitled to take action and discipline these officers before that trust could be eroded. Their claims of retaliation for any arguably protected speech are implausible and no amount of discovery could aid in establishing that their unprotected and well-publicized posts in this case were not the reason they were disciplined.

For these reasons, the Officers insufficiently alleged the two elements of a First Amendment retaliation claim. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). First, they cannot show that any of their speech was protected by the First Amendment. Second, even if some portion of their speech were protected (which the City does not concede), the Officers cannot plausibly allege that this speech was a substantial factor in the Department's disciplinary decisions.

I.  **The District Court correctly applied the *Pickering* balancing test as a matter of law to determine that the Officers' posts were not protected by the First Amendment.**

Because the question of whether an employee engaged in protected speech is ultimately a question of law, the District Court properly dismissed the Officers' claim. Given the magnitude and egregious nature of the posts referred to in the pleadings, the District Court properly found that the Philadelphia Police

Department's interest in maintaining public trust and efficient operations outweighed the Officers' interests in posting their racist, intolerant, and violent rhetoric on Facebook. *See* JAppx31 (Dist. Ct. Op. at 27).

### A. Legal framework for analyzing First Amendment free speech rights of public employees.

Before addressing the particulars of the Officers' speech in this case, it is helpful to first examine how the Officers' free speech rights are tempered by balancing that speech with the operational needs of the Police Department in its role not as sovereign, but as an employer.

As an initial matter, it is axiomatic that the government in its role as employer has a "freer hand in regulating the speech of its employees that it has in regulating the speech of the public at large[.]" *Watters v. City of Phila.*, 55 F.3d 886, 896 (3d Cir. 1995) (quoting *Waters v. Churchill*, 511 U.S. 661, 671 (1994)). This heightened regulation stems from the "common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983); *see also Palardy v. Twp. of Millburn*, 906 F.3d 76, 81 (3d Cir. 2018) (public servants "by necessity must accept certain limitations on his or her freedom" (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). This is particularly true for law enforcement entities, which enjoy even greater flexibility in regulating their officers. *Kelley v. Johnson*, 425 U.S. 238, 246 (1976) (police departments should be granted deference to make choices related to

"discipline[,] esprit de corps, and uniformity"); *see also, e.g.*, *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000) ("In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers other than government employers.").[24]

With those overarching limitations in mind, a public employee's speech is constitutionally protected by the First Amendment only if: (1) in making it, the employee spoke as a private citizen; (2) the statement involved a matter of public concern; and (3) the interest in speaking outweighs the government's interest in promoting workplace efficiency and avoiding disruption. *Hill*, 455 F.3d at 241–42 (quoting *Garcetti*, 547 U.S. at 418).

For purposes of this Motion to Dismiss, the City agrees that the Officers' posts were made as private citizens, satisfying the first prong of this analysis. With respect to the second prong of "public concern," the City does not argue that *none* of these

---

[24] The Police Department's heightened ability to maintain discipline, even in matters of off-duty speech, is reflected in its Social Media Policy. It reads, in relevant part: "[E]ach member must strive to maintain public trust and confidence not only in his or her professional capacity, but also in his or her personal and on-line activities. Moreover, *as police personnel are necessarily held to a higher standard than general members of the public* the online activities of employees of the police department shall reflect such professional expectations and standards." JAppx90-91. Am. Compl. Ex. A; Directive 6.10-2(B). In its Opinion, the District Court noted that through this Social Media Policy, the Officers knowingly accepted this higher standard but nonetheless chose to violate it. JAppx30 (Dist. Ct. Op. at 26).

posts touched upon matters of public importance, although the District Court was appropriately "not convinced that all of the Plaintiffs' posts involved matters of public concern." JAppx26 (Dist. Ct. Op. at 22 n.18).[25]

In any event, this Court need not consider whether these posts passed the "public concern" threshold because the Officers' claim fails under the third and final prong, which is a balancing test derived from *Pickering v. Board of Education of Township High School, District 205, Will County, Illinois*, 391 U.S. 563 (1968). Under this test, even if the employee spoke as a private citizen on a matter of public concern, the court must then weigh the employee's interest in their speech against the government's interest in the performance of its functions and preventing workplace interference or disruption. *Id.* at 568-73; *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015), *as amended* (Oct. 25, 2019).

A government employer's operational interests that may justify restraint on employee speech include promoting integrity, maintaining proper discipline—and crucially here—upholding public trust and accountability. *See Garcetti*, 547 U.S. at 418-20; *Pickering*, 391 U.S. at 568-70; *Rankin v. McPherson*, 483 U.S. 378, 390-91 (1987). Employee speech considered disruptive to these institutional interests

---

[25] Arguably, even though some of these posts addressed issues of the day, many were so outrageous and inappropriate that they provided "no basis for finding that [they were] of concern to the community." *Cf. City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84-85 (2004) (finding officer's sexually explicit video did not address matter of public concern).

depends on whether the speech has or is likely to: (1) impair discipline by superiors or harmony among co-workers; (2) detrimentally impact close working relationships for which personal loyalty and confidence are necessary; or (3) impede the performance of the speaker's duties or interfere with the regular operation of the enterprise. *Rankin*, 483 U.S. at 388; *Munroe*, 805 F.3d at 472. Further, although the inappropriate or pejorative tone of the speech may be irrelevant to the prefatory "public concern" prong,[26] it plays a crucial in "ascertaining the existence and likelihood of disruption," under the *Pickering* balancing test, especially where (as here) an employee directs that speech at the "very persons the governmental agency is meant to serve." *Munroe*, 805 F.3d at 474.

Again, the *Pickering* balancing test—and the ultimate question of whether speech is constitutionally protected by the First Amendment—are legal determinations that require a court's "independent constitutional judgment on the facts of the case." *Connick*, 461 U.S. at 148 n. 7 and 150 n. 10 (internal quotation marks omitted). While this balancing test is normally fact intensive, *see Munroe*, 805 F.3d at 472, there is already a developed record in this case even at the pleadings stage given the fact that the Officers admit that they authored the over 250 posts and comments at issue. Here, the District Court considered the developed factual record

---

[26] *See Rankin*, 483 U.S. at 387 (The "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.").

that existed, even at the pleadings stage, and determined that the City's interest in avoiding disruption in its police force far outweighs any interest the Officers had in their Facebook posts, which consistently revealed an unacceptable level of animus against members of the community they were sworn to serve and protect.

**B.      The District Court correctly determined that the Officers' interest in their biased and violent speech could not overcome the Police Department's interests in effective operations and maintaining public trust.**

The District Court weighed the Police Department's operational interests against the value of the Officers' relatively weak interest in the pejorative and inflammatory speech at issue in this case, ultimately determining that the Police Department's interests in orderly operations, public trust, and a diverse workforce prevailed. In balancing these interests, District Court correctly noted the Police Department's "broad discretion" and determined that the racist and violent nature of their speech weakened its import in the face of public backlash. JAppx31 (Dist. Ct. Op at 27). At bottom, the Officers' speech has the potential to (and actually did) perpetuate the public's and the City's concern that its police force cannot serve the community in a respectful, measured, and unbiased manner. Accordingly, the District Court found that the Police Department had an adequate justification to discipline or terminate the Officers.

**1.    The Officers' discriminatory and violent speech was reasonably calculated to be disruptive to the Police Department's overall operations and public safety mission.**

First, on the City's side of the scale, the District Court acknowledged that the Police Department has compelling interests in "maintaining and preserving the public's trust and promoting a diverse workforce," "efficient prosecution," and "maintaining orderly internal operations and avoiding potential disruptiveness"— along with broad discretion to foster and enforce those interests. JAppx27 (Dist. Ct. Op. at 23). It also recognized that Officers' posts can be separated generally into two categories that courts regularly label as likely disruptive to these compelling interests: (1) speech indicating bias or animus regarding race, ethnicity, religion, sexual orientation or gender identity; and (2) speech promoting violence, extrajudicial punishment, vigilantism, police brutality, misuse of police power, or lack of respect for due process. JAppx30-31 (Dist. Ct. Op. at 26-27). Each Officer has posts that fall into at least one if not both of these categories, analyzed separately below.

**a.    Racist and otherwise biased speech.**

With respect to the first category, a police department's interest in maintaining the public trust of a diverse city and promoting harmony within a diverse workforce outweighs an officer's interest in racist and otherwise biased speech, as illustrated by the Second Circuit in *Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002) and its

progeny, *Locurto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006).  In *Pappas*, the Second

Circuit determined that the NYPD was justified in terminating an officer who stuffed

mailer reply envelopes sent from an auxiliary police department with overtly Black

and anti-Semitic materials. *Pappas*, 290 F.3d at 144-45 (specifying that the materials

warned against the "Negro wolf . . . destroying American civilization with rape,

robbery, and murder," and claimed that "the Jews control the TV networks and why

they should be in the hands of the American public and not the Jews"). Four years

later, the Second Circuit in *Locurto* found that the NYPD justifiably disciplined an

off-duty officer for his participation in a parade float in which participants donned

blackface and Afro wigs, displayed stereotypical African-American food, and

parodied a recent hate crime death of an African-American man. *Locurto*, 447 F.3d

at 164-65. In these cases, the Second Circuit found the speech at issue likely to cause

disruption and held NYPD's interests far outweighed the officers' speech that treats

whole segments of the community with contempt.[27]

---

[27] Importantly, the speech need not be explicitly racist or biased to be worthy of discipline. Covert and coded forms of racism and bias—*i.e.* the invocation of well-known racial and ethnic stereotypes—is equally actionable. *See, e.g.*, *Locurto*, 447 F.3d at 164-65 (racist parade float participants utilized stereotypes of African-American food). Further, words like "thug," "ghetto," "welfare queen," and "savage" are examples of "facially non-discriminatory terms [that] can invoke racist concepts . . . already planted in the public consciousness." *Lloyd v. Holder*, No. 11 Civ. 3154, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013).

This contempt triggers external disruption, causing members of the targeted community to "regard the police as oppressor rather than protector," and making them "less likely to report crimes, to offer testimony as witnesses, and to rely on the police for their protection." *Pappas*, 290 F.3d at 146-47. Put even more bluntly, the First Amendment does not "require a public employer to 'sit idly by' while its police officers and firefighters make racial insults 'against those they are hired to serve and protect.'" *Munroe*, 805 F.3d at 474 (quoting *Locurto*, 447 F.3d at 159). Rather, an officer's "invective" speech against the members of public "could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations." *Id.*

In addition to this external disruption, an officer's biased speech causes internal disruption to a police department. For example, a police officer's discriminatory speech can damage trust and close working relationships between other police officers who are members of the targeted community, especially where police officers often rely on each other in life-threatening situations. *See Pappas*, 290 F.3d at 149 ("[F]or police officers of one race to express hatred or scorn for members of another race obviously fans anger, dissention and racial tensions among officers of different races and thus inflicts harm of a second kind on the Department's performance of its mission."); *see also, e.g.*, *Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 867 (10th Cir. 1998) ("[P]ersonal loyalty and confidence are

especially important among police officers, who are charged with ensuring public safety and who often must work together in life-and-death situations."). If these biased attitudes are allowed to flourish within the ranks, a police department's ability to recruit and train personnel from diverse communities will suffer. *Pappas*, 290 F.3d at 147.

Here, the Officers made posts functionally identical to the content in *Pappas* and *Locurto*. Numerous posts not only ridicule Islamic cultural practices, but also indicate that Muslims cannot be "good" Americans [SAppx91] and even go so far as to call for "Death to Islam." [SAppx130]. Equally troubling are the many other posts that demonstrated overt racism, like Mr. Gack's chimpanzee meme[28] [SAppx56] and Mr. Fenico sarcastically wondering why "there's no epidemic of white cops shooting white kids" [SAppx28]; and also those that utilized more covert forms of racism, like use of trigger words, stereotypes, and tropes (*i.e.* Mr. Acquaviva's "Thuggies" meme) [SAppx118]. Like the NYPD in *Locurto* and *Pappas*, the Police Department rightfully considered the Officers' biased speech

---

[28] With regard to the "Obama Voters" meme: depicting primates to lampoon Black people is a hackneyed racist trope, and portrayal of outstretched hands calls upon the "welfare queen" stereotype that is often ascribed to Black and/or poor communities. *See, e,g.*, *Spence v. Bukofzer*, No. 15 Civ. 6167, 2017 WL 1194478, at *8 (S.D.N.Y. March 30, 2017) (recognizing that referring to Black employees as "monkeys" is derogatory); *Fisher v. Mermaid Manor Home for Adults*, 192 F. Supp. 3d 323, 329 (E.D.N.Y. 2016) (same); *Lloyd*, 2013 WL 6667531, at *9 (invoking "welfare queen" stereotype as a facially non-discriminatory phrase).

likely to cause disruption within a diverse workforce and erode the public's faith in its police officers.

The District Court agreed, observing the police officers and the Department itself "must continuously deal with individuals from multiple walks of life, regardless of their race, creed, sex, and religion." JAppx31 (Dist. Ct. Op. at 27). It catalogued many instances where the Officers blatantly lampooned others' race, ethnicity, religion, and LGBTQ status. JAppx30 (Dist. Ct. Op. at 26) (Officers used transgender individuals as "punchlines" and "played racist bingo, mocking as many ethnic or religious groups as possible"). Accordingly, the District Court concluded that the Officers' posts perpetuated a widespread public perception that police officers are racist and cannot serve the community they were sworn to protect. JAppx31. Under *Pappas*, *Locurto*, and *Munroe,* that alone is sufficient to show reasonable likelihood of disruption.

Lastly, the District Court also held that the Officers' posts impeded efficient criminal prosecution. First, it noted for those three Officers who were placed on a "Giglio" list, they are effectively barred from testifying in criminal prosecutions, which in turn prevents their ability to carry out an important police function and is thus disruptive to the Police Department's operations. *See* JAppx31 (Dist. Ct. Op. at 27); *see Lane v. Franks*, 573 U.S. 228, 247 (2014) (Thomas, J., concurring) (noting that police officers testify as "a routine and critical part of their employment duties");

*cf. Henry v. Johnson*, 950 F.3d 1005, 1012 (8th Cir. 2020) ("If prosecutors will no longer press charges from a particular police officer, this would seriously impede the agency's ability to perform its function."). But, even for those Officers who were not placed on such list, their posts would be fair game on cross-examination to impugn their credibility and demonstrate bias on the witness stand, especially in cases involving claims of racial or ethnic profiling. *See* JAppx28 (Dist. Ct. Op. at p. 24); *see also* Officer Br. at 15, 27-28 (suggesting that because only three Officers were placed on a Giglio list, the District Court improperly relied on this fact as proof of disruption as applied to all Officers).

Accordingly, the District Court properly found that the Officers' discriminatory speech had the capacity to (and did) disrupt institutional operations.

### b. Violent speech/lack of respect for due process.

Next, the potential disruptiveness within the Police Department is not limited to speech that is racist, anti-Muslim, or otherwise biased. The Officers' posts are also rife with statements that advocate extrajudicial violence and punishment, vigilantism, and more specifically, police abuse of force and power. These posts also erode trust in the police force because they celebrate harm to people they are sworn to protect and serve and cause the public and the Department to question whether these Officers will act fairly and legally when arresting citizens and using force. And, again like the Officers' racist, Islamophobic, and anti-LGBTQ posts discussed

above, these violent posts could also be used as damning impeachment material to an Officer's credibility on the witness stand, particularly in cases involving excessive force allegations.

For example, the Fourth Circuit in *Grutzmacher v. Howard County* found that county officials justifiably terminated a Fire Department paramedic who advocated violence on Facebook. 851 F.3d 332 (4th Cir. 2017). There, a plaintiff posted on Facebook regarding news coverage of a gun control debate. Plaintiff, appearing in jest to replace the word "liberal" with "gun," posted "[m]y aide had an outstanding idea. . . lets all kill someone with a liberal. . . then maybe we can get them outlawed too! Think of the satisfaction of beating a liberal to death with another liberal . . . ." *Id.* at 338.  The Fourth Circuit held that this post "frustrated the Department's public safety mission and threatened community trust in the Department, which is vitally important to its function," reasoning that the post "advocat[ed] violence to certain classes of people" and to "effect a political agenda." *Id.* at 343, 346-47 (internal quotation marks omitted). Ultimately, the court concluded that the "potential for Plaintiff's statements to diminish the Department's standing with the public further weighs in favor of the Department." *Id.* at 347.

Similarly, posts that celebrate and advocate misuse of police force and brutality are a more pernicious subset of violent speech.  In *Venable v. Metropolitan Government of Nashville*, the day after the police shooting of Philando Castile made

national news, a police officer responded to a Facebook thread stating that Castile was shot four times, commenting "Yeah, I would have done 5." 430 F. Supp. 3d 350, 353 (M.D. Tenn. 2019). The officer's post went viral and he was terminated. In affirming the termination, the court had "no hesitation in concluding that MNPD could reasonably predict that Venable's comments would be disruptive to its mission and affect officer morale." *Id.* at 360.

Here, 11 out of the 12 Officers, and *at least* 30 out of the 250 posts published by the Plain View Project promote extrajudicial violence, vigilantism, misuse of power, and demonstrate an overall lack of respect for due process. SAppx23-269. Prime examples of this problematic content are: Mr. Gack and Mr. McCammitt's memes depicting protestors being dragged and sprayed in the face with tear gas by officers; and Officer Amato's post celebrating police use of force by commenting that she hoped police would run over a suspect. *See* SAppx44, 68, 126.

The District court agreed, noting the Police Department's interests in "mitigating the public's perception of excessive police force, [and] preserving citizens' due process rights and right to assemble." JAppx31 (Dist. Ct. Op. at 27). In support, it catalogued many other instances where Officers engaged in violent rhetoric contrary to these interests. For example, it noted Mr. Anzideo's comment that the Boston Marathon bomber should be killed in prison espoused his lack of respect for an individual's due process rights. JAppx17 (Dist. Ct. Op. at 13).

Similarly, it found that Officer McGough's calls to "eliminate" "alt-left extremists" was "especially troubling as this would presumably include many of the citizens of the City of Philadelphia, members he swore to serve and protect." JAppx20 (Dist. Ct. Op. at 16).[29] Accordingly, as was the case with the posts displaying animus based on religion and race, the Police Department reasonably calculated the Officers' violent posts to be disruptive to the Department's overriding interest in maintaining the public trust and effective prosecutions.

---

[29] *See also*, *e.g.*, JAppx13 (Dist. Ct. Op. at 9, noting Mr. Fenico's comment "who cares, kid and mom are scumbags" to article on police brutality); JAppx14 (Dist. Ct. Op. at 10, describing Mr. Young's posts (1) supporting the Italian Police for "hav[ing] no mercy" against protestors and (2) suggesting that people should not resist arrest in response to post showing officers breaking a man's leg after a traffic stop); JAppx15 (Dist. Ct. Op. at 11, noting Mr. Gack's post supporting extrajudicial execution of child molesters and encouraging violence against transgender individuals); JAppx16 (Dist. Ct. Op. at 12, highlighting Mr. McCammitt's posts suggesting that "protestors should run over by trains, motor vehicles, or be treated as speed bumps."); JAppx18 (Dist. Ct. Op. at 14, pointing out Officer Amato's post that police "NEED TO START FIGHTING BACK" against "the savages" who protested in front of the home of an officer charged with murder); JAppx19 (Dist. Ct. Op. at 15, noting that one of Officer Bowdren's posts "endorsed execution before the suspects could exercise their right to trial"); JAppx20 (Dist. Ct. Op. at 16, noting Officer Sheridan's celebration of a prison rape).

**2.      The Officers failed to show that their weak interest in discriminatory and violent speech outweighed the Police Department's compelling interests in efficient operations and maintaining the public trust.**

On the Officers' side of the scale, the District Court properly held that their free speech interests in their posts were relatively low and therefore could not overcome the importance of the Police Department's operational interests.

For their part, the Officers argue the "political" nature of their speech on topics of public importance like "Islamic terrorism," "violent protests" and "child molestation" entitles them to enhanced First Amendment protection in the *Pickering* analysis. Officer Br. at 6, 11, 13, 19-20. They are wrong, however, because they completely ignore the egregiously offensive manner of any political commentary they may have been attempting to make.

The *Pickering* balancing test is a "sliding scale" where "the amount of the disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015), *as amended* (Oct. 25. 2019) (internal quotation marks omitted). As instructed by this Court in *Munroe*, while the inappropriate tone of the speech may be irrelevant to the prefatory "public concern" prong, it can play a "critical role" for *Pickering* balancing purposes in "ascertaining the existence and likelihood of disruption." *Id.* Moreover, inappropriate tone is especially harmful

when it is directed at the "very persons the governmental agency is meant to serve." *Id.* at 474.

In *Munroe*, this Court upheld a public school teacher's termination for incendiary blog posts about her students, which included disparaging intellectually disabled students and labelling others as "Rat-like," a "sneaky, complaining, j---off" and a "[r]ude, belligerent, argumentative f—k," among other aspersions. *Id.* at 476. While some of her posts touched on matters of public concern like "academic integrity, honor, and the importance of hard work," this Court afforded her speech minimal weight, finding that her "opprobrious tone" against the people served by the school was "likely to cause a strong reaction" and ultimately "devalue[d]" her discussion of public issues. *Id.* at 468-70, 472-74. Significantly, *Munroe* analogized the teacher's vitriol against her students to that of the racial insults by police officers against the public in *Locurto*, holding that "invective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations." *Id.* at 474.

*Munroe*'s reasoning applies equally here. Although the Officers' chosen topics viewed in isolation may have obliquely touched on political and social matters, they fail to recognize that the majority of these posts were also tinged with an overlay of hateful and mocking rhetoric that in no way invited serious discourse

on their alleged concerns. *See, e.g.*, JAppx26 (Dist. Ct. Op. at 22) (finding that Officer Gack's meme ridiculing incarcerated fathers [SAppx58] "did not serve or add to any public debate"). For example, while their posts about so-called "Violent Protests" *may* be seen as touching upon an issue of public concern (*i.e.* a person's free speech right to protest), the vast majority of these posts merely advocate police violence against protestors and do not seriously engage in any substantive discourse about the subject of protests.[30] The same goes for the vast majority of the Officers' posts about Muslims. Again, while the topic of religion may be considered an issue of public or social interest, numerous posts merely lampooned Islamic cultural practices or perpetuated harmful overgeneralizations of a religion practiced by over two billion people.[31] Still, some Officers just called for its wholesale eradication.[32]

---

[30] *See, e.g.*, SAppx69, 146 (memes suggesting that protestors should get hit by trains and run over by cars); SAppx76 ("[W]hen you get shot in the groin by a rubber bullet and your made up gender doesn't protect your willie"); SAppx81 (meme comparing protestors to speed bumps); SAppx101 ("No one cares about your stupid protest.").

[31] *See* SAppx37 ("Happy Ramadan" meme depicting a woman in a bikini leaning against a pig); SAppx93 ("Muslims hate pork, beer, dogs, Jesus, and freedom of speech"); SAppx105 (trash bag meme); SAppx104 ("All I want to do is move to your country, rape your women, bomb your buses, riot in your streets . . . ."); SAppx257 ("Ban Islam from all Western Nations").

[32] SAppx130, 192 (memes calling for "Death to Islam" and that Trump hired General Mattis to "exterminate" Muslims).

The District Court properly recognized the Officers' façade of "political speech," noting that the main focus of many of their posts—racism, bigotry, and violence—actually weakened their interest in that speech, especially in contrast to the substantial weight of the Police Department's interests in this case. JAppx31 (Dist. Ct. Op. at 27). This reasoning is well supported. *See, e.g.*, *Munroe*, 805 F.3d at 473 ; *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) (holding, in the context of government employee speech, that "[t]he less serious, portentous, political, significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression"); *Grutzmacher*, 851 F.3d at 347-48 (noting that the unprotected racist and violent speech at issue was "not of the same ilk" as other cases where employees' protected speech was "grounded in specialized knowledge or expresses a general concern about the inability of the Department to carry out its vital public mission effectively" (alterations omitted)).

Thus, it is abundantly clear that the Officers cannot show that their interest in disseminating derogatory and violent speech is more important than the City's interest in maintaining harmony within its ranks, efficient criminal prosecution, and keeping the public's trust in law enforcement. Based on this record, the District Court correctly determined that the Police Department had ample justification for its

disciplinary decisions based on its reasonable prediction that the Facebook posts would be both externally and internally disruptive to police operations.

### C. The Officers' remaining arguments regarding the age of the posts, the Police Department's alleged political bias, and purported need for discovery to prove "absence of disruption" and resolve "sharply disputed facts" provide no plausible basis to overturn dismissal.

The Officers set forth various arguments to attack the District Court's conclusion that fail.

First, the Officers claim that many of their posts were several years old, dating back to 2012, and thus there can be no "nexus" between their posts and their disruptive potential. Officer Br. at 17. Time did not cleanse the disruptive effect of the Officers' Facebook posts because they only first came to light in 2019. The fact that these posts were found, nationally published, and subsequently discovered by the Police Department in 2019 is the controlling consideration. Nor does the passage of time indicate to the Police Department that an Officer no longer subscribes to these offensive views. In any event, the Officers' posts were just as harmful and inappropriate in 2012 as they are today.

Second, the Officers argue that it was unfair for the City and the District Court to factor the public's recent increased scrutiny of the police and public outcry against police killings of unarmed Black men into the *Pickering* analysis. Officer Br. at 25-26. The Officers claim that by doing so, the District Court inappropriately tied the Officers' First Amendment rights to an "arbitrary 'sliding scale' tied to whatever

'national scrutiny and outcry' may be prevalent at the time." *Id.* at 26. However, it was perfectly acceptable for the Police Department—the quintessential public-facing entity—to believe that public backlash increases the disruptive potential of this offensive speech. *Locurto*, 447 F.3d at 179 (finding that government employer "may, in termination decisions, take into account the public's perception of employees whose jobs necessarily bring them into extensive public contact"); *cf. Munroe*, 805 F.3d at 473 (parents' reaction to teacher's blog posts relevant to disruptiveness determination).

Third, the Officers assert that the Police Department discriminatorily enforced the Social Media Policy by failing to discipline other officers (whose posts were not published by Plain View) that posted content "espousing opposing political views."[33] *See* Officer Br. at 3, 14. But they do not allege that the Police Department even knew that these posts existed. Nor could they, as their argument suggests that once Plain View released its database, the Police Department had some independent duty to comprehensively search all other officers' social media pages in an effort to

---

[33] In their Amended Complaint, the Officers copied and pasted several screen grabs of other officers' Facebook posts that they claim utilized "extremely foul, racist, and inflammatory language" but espouse opposing political views from their own. JAppx83-87. The Officers alleged that Plain View Project published none of these posts and accused the Police Department of viewpoint discrimination for not disciplining these other officers. However, the Plain View Project is not an entity affiliated with the City or the Police Department, so whether Plain View "singled them out" is wholly irrelevant to any claims against the City. JAppx84-85 (Am. Compl. ¶¶ 314, 317).

uncover disruptive posts that Plain View did not capture. The Police Department was not obliged to do so. Rather, it properly issued discipline based on the information it had in front of it based on the Plain View database.[34]

Lastly, the Officers attack dismissal and claim entitlement to discovery on two separate fronts. Initially, they suggest that they are entitled to discovery to prove "the absence of disruption." *See* Officer Br. at 5, 15-16, 24. But, as set forth above, proof of "actual" disruption is not necessary for an employer to take disciplinary action. Instead, the correct standard (which the Officers ignore on appeal), is whether the employer can show that the speech was *likely* to cause disruption. *Munroe*, 805 F.3d at 472, 479. Again, the Police Department justifiably disciplined the Officers on a reasonable prediction that racist, violent, and Islamophobic speech would be disruptive by their very nature, as demonstrated by cases like *Pappas*, *Locurto*, and *Grutzmacher*. And, like all of the other factors of the *Pickering* analysis, this too is a question of law. Simply put, the City and the Police Department did not need to sit

---

[34] To the extent the Officers couch this as a Fourteenth Amendment claim either under due process or equal protection theories, they have either abandoned it for failure to brief it on appeal (due process) or waived it entirely for failure to plead it as a separate count in the Amended Complaint (equal protection). *See* fn.1, *supra*; *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) (arguments first raised on appeal are waived).

"idly by" and wait for the Officers' posts to cause actual disruption before it took disciplinary action. *Locurto*, 447 F.3d at 183.[35]

Further, the Officers claim that "sharply disputed facts" should have barred dismissal because most cases involving *Pickering* balancing occur on a "developed factual record" either at summary judgment or after trial. Officer Br. at 23. But, this case is different.  Namely, none of the Officers dispute that they wrote the over 250 posts attributed to them by Plain View, so there is no factual dispute (let alone a "sharply disputed" one) surrounding whether they in fact authored the speech at issue. These undisputed posts, which the Officers attached to the Amended Complaint, provided the District Court with more than enough factual material to engage in a *Pickering* analysis.

The Seventh Circuit's decision in *Craig v. Rich Township High School District 227* is an apt comparator. 736 F.3d 1110 (7th Cir. 2013). There, a public school guidance counselor claimed he was unjustly discharged for writing a relationship advice book that contained hypersexualized descriptions of women. *Id.* at 1113, 1119. The Seventh Circuit affirmed dismissal under Rule 12(b)(6), agreeing that the school district's predictions of disruption—especially between the guidance

---

[35] *See also Connick v. Meyers*, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity for an employer to allow events to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."); *Munroe*, 805 F.3d at 474 (citing *Locurto*, 447 F.3d at 183).

counselor and female students—were entirely reasonable. *Id.* at 1120. The guidance counselor, like the Officers here, argued that it was improper for the district court to engage in *Pickering* balancing at the Motion to Dismiss stage. *Id.* at 1121. But the Seventh Circuit disagreed, noting that because the counselor attached the entire book to his complaint, he provided an "adequate basis to perform the *Pickering* balancing test." *Id.* ("[T]his is one of those rare cases where a plaintiff, by pleading too much, has pled himself out of court. . . . While most First Amendment retaliation claims will not be amenable to resolution on the pleadings, Craig's complaint and supporting documents place this case in a category of the exception rather than the rule." (internal quotation marks and alterations omitted)).

*Craig*'s observation is on all fours with this case. That court had the plaintiff's book in the record, and here, this Court has the Facebook posts for which the Officers were disciplined in the record. The District Court therefore had sufficient facts before it to weigh the Officers' speech against the Police Department's operational interest. [36] Given these compelling interests, coupled with the broad discretion law

---

[36] Moreover, *Craig* is not an anomaly. Other cases, including one from this Circuit, have engaged in *Pickering* balancing based on the undisputed facts in the pleadings alone. *See Muti v. Schmidt*, 118 F. App'x 646, 648 (3d Cir. 2004) (nonprecedential); *see also, e.g.*, *Garza v. Escobar*, 972 F.3d 721, 728 (5th Cir. 2020) (where the reasonable inferences drawn from a complaint do not "plausibly show that the employee's interests outweigh the employers . . . *Pickering* balancing can be performed at the motion-to-dismiss stage . . . . it would be 'illogical to say that something is a question of law, and that it is reviewed de novo, yet it can never be decided on the pleadings." (quotation omitted)); *Jefferson v. Ambroz*, 90 F.3d

enforcement agencies have in maintaining discipline within their ranks, the District Court did not err in dismissing the Officers' claims.

## II. Even if some of the Officers' posts published by Plain View were protected, they cannot plausibly allege the second prong of the First Amendment retaliation analysis—that this allegedly protected speech was a substantial factor in the Police Department's disciplinary decisions.

Finally, the Officers are correct that the Police Department disciplined or terminated them for their speech that was incompatible with their Oaths, the Social Media Policy, and the Police Department's overall public safety mission. Officer Br. at 5, 25 29. Those decisions were the Police Department's prerogative and not unconstitutional, as the District Court held. Notwithstanding, the Officers appear to argue that some (or even all) of their posts constituted protected speech, doing so without pointing to which specific posts they believe outweigh the Police Department's operational interests so as to be protected. They further claim that it was improper for the Police Department to factor any arguably protected speech into its disciplinary decisions. However—given the sheer breadth of the Officers' clearly unprotected posts—it is implausible that any arguably protected posts played any substantial factor in the Police Department's ultimate disciplinary decisions.

---

1291, 1297 (7th Cir. 1996) ("no additional facts" adduced through discovery would have changed the outcome of plaintiff's case).

The second prong of the First Amendment retaliation analysis requires that a court consider whether an employee's allegedly protected speech was a substantial or motivating factor in their discipline. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). It follows, however, that even if protected speech did in some way factor into an employee's discipline, the employer could still defeat a First Amendment retaliation claim by showing that it would have made the same decision even absent this protected speech. *Id.* at 241 n. 23 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

As an initial matter, the District Court did not reach these questions because, after scrutinizing the Officers' posts, it found that "any and all the posts Plaintiffs provided in their Amended Complaint are sufficient to establish disciplinary action" and supported its decision with a detailed analysis. JAppx39 (Dist. Ct. Op. at 25). If this Court agrees that all the Officers' posts published by Plain View were unprotected, it could end its analysis there without reaching this second prong.

While resolution of these questions typically occur after discovery, given the unprecedented breadth and extreme nature of the Officers' posts (which they do not dispute they authored), the Officers cannot plausibly contend that any of their arguably "protected" posts played a substantial role in their discipline. The Police Department had a clear and legitimate basis to terminate or discipline each Officer.

*cf. Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (given "more likely explanations" for detention, factual allegations did not plausibly establish discriminatory motive).

Moreover, it is equally implausible for Officers argue that the Police Department would have reached a different disciplinary decision if the "protected posts" were out of the picture. *Mt. Healthy*, 429 U.S. at 285-87 (defendants may defeat a retaliation claim if the same action would have been taken in absence of the protected conduct). As discussed in Subsection I.B.2 above, this case does not concern officers disciplined for engaging in any thoughtful public commentary on immigration policy toward Muslims; the appropriate level of force to use against protesters; or on the status of the relationship between the Black or LGBTQ community and police. Rather, as discussed, these were utterly inappropriate, offensive, racist, xenophobic posts that also contained a healthy dose of advocacy for illegal violent action by both police and vigilante citizens. As such, the notion that any milder content within these posts might have been a major factor in the decision to discipline these Officers is absurd.

Further, this Court recognized that there may be cases where this defense can be decided as a matter of law based on the pleadings: "In some circumstances, the legitimate basis for the [employer's] actions may be so apparent that the plaintiff's allegations of a retaliatory motive could not alter the conclusion that under the circumstances alleged in the pleadings, the defendants would have been compelled

to reach the same decision even without the protected First Amendment activity."
*Larsen v. Senate Com. of Pa.*, 154 F.3d 82, 95 (3d Cir. 1998). This is such a case. [37]

Ultimately, this Court does not need to ignore common sense. The Officers'
arguments that *some* of their speech may be protected does not render their claims
plausible. The Officers cannot be placed in a better position than they would have
occupied just because they published some modicum of allegedly protected speech.
When presented with over 250 posts, the Police Department, as a law enforcement
agency, was within its right to act swiftly to mitigate disruption and should be able
to do so without the fear of turning each employment decision into an expansive
constitutional inquiry. *Cf. Pension Benefit Guar. Corp. v. Morgan Stanley Inv.
Mgmt.*, 712 F.3d 705, 719 (2d Cir. 2013) ("[T]he price of entry, even to discovery,
is for the plaintiff to allege a *factual* predicate concrete enough to warrant further
proceedings, which may be costly and burdensome." (citation and quotations

---

[37] Notably, in *Muti*, a panel of this Court still affirmed dismissal the employee's First
Amendment retaliation claim regarding his unprotected speech even when that
employee also pointed to four other prior of arguably protected speech activity.
118 F. App'x at 649 n. 1. It noted that "to succeed on this additional claim, Muti
must show the protected activity was a substantial or motivating factor in the
alleged retaliatory action. If he can do so, Schmidt, as employer, can rebut this
claim by demonstrating that he would have reached the same decision even in the
absence of the protected conduct. *Typically, this is a fact based inquiry* not
appropriate for resolution upon a motion to dismiss. Nevertheless, we agree that
we can dismiss Muti's claim as a matter of law *because of the detailed factual
allegations in the complaint demonstrate that his previous speech activity was not
a substantial or motivating factor in his termination*." *Id.* (citations and internal
quotation marks omitted) (emphasis added).

omitted)). Accordingly, the District Court's reasoned determination should not be disturbed.

## CONCLUSION

Wherefore, for the foregoing reasons, the City respectfully requests that this Court affirm the District Court's order granting the City's Motion to Dismiss.

Respectfully submitted,

CITY OF PHILA. LAW DEPARTMENT
DIANA P. CORTES, CITY SOLICITOR

*/s/ Meghan Byrnes*
By: Meghan Byrnes, Esq.
Deputy City Solicitor, Appeals
City of Philadelphia Law Department
Appeals Unit
1515 Arch Street, 17th Floor
Philadelphia, PA 19102-1595
(215) 683-5011
meghan.byrnes@phila.gov
*Attorney for Appellee City of Philadelphia*

Date: July 11, 2022

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to the Third Circuit Local Appellate Rule 46.1(e), I hereby certify

that I am a member of the bar of this Court.

*/s/ Meghan Byrnes*
Meghan Byrnes, Esq.
City of Philadelphia Law Department

Date:  July 11, 2022

## CERTIFICATION OF COMPLIANCE WITH RULE 32(a) AND REQUIREMENTS FOR ELECTRONIC FILING

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, Type Style Requirements,
and Electronic Filing Requirements.

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains **12,339** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

3.      Pursuant to the Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the hard, paper copies of the brief.

4.      Pursuant to the Third Circuit Local Appellate Rule 31.1(c), I hereby certify that a virus detection program was performed on this electronic brief/file using Carbon Black Cloud Sensor software, and that no virus was detected.

*/s/ Meghan Byrnes*
Meghan Byrnes
City of Philadelphia Law Department

Date:  July 11, 2022

## CERTIFICATE OF SERVICE

I, Meghan Byrnes, hereby certify that I caused to be served today the foregoing **Brief for Appellee City of Philadelphia** upon the persons and in the manner indicated below:

Via CM/ECF:

Larry L. Crain, Esq.
Crain Law Group, PLLC
5214 Maryland Way, Suite 402
Brentwood, TN 37027
*Counsel for Plaintiffs-Appellants Christian Fenico et al.*

Jonathan J. Sobel, Esq.
Law Offices of Jonathan J. Sobel
1500 Walnut Street, Suite 2000
Philadelphia, PA 19102
*Counsel for Plaintiffs-Appellants Christian Fenico et al.*

*/s/ **Meghan Byrnes***
Meghan Byrnes
City of Philadelphia Law Department

Date: July 11, 2022