PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1326

_____

CHRISTIAN FENICO; THOMAS YOUNG;
THOMAS GACK; EDWARD MCCAMMITT;
TANYA GRANDIZO; ANTHONY ANZIDEO;
ANTHONY ACQUAVIVA; WILLIAM BOWDREN;
JOSEPH PRZEPIORKA; KRISTINE AMATO;
RAPHAEL MCGOUGH; FRANCIS SHERIDAN,
                                    Appellants

v.

CITY OF PHILADELPHIA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.:  2-20-cv-03336)
District Judge:  Honorable Petrese B. Tucker

_____

Argued December 14, 2022

Before RESTREPO, McKEE,* and SMITH, *Circuit Judges*

_____

* Judge McKee assumed senior status on October 21, 2022.

(Opinion filed:  June 8, 2023)


LARRY L. CRAIN          **[ARGUED]**
CRAIN LAW GROUP, PLLC
5214 Maryland Way, Suite 402
Brentwood, TN 37027

*Counsel for Appellants*


DIANA P. CORTES
MEGHAN BYRNES          **[ARGUED]**
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

*Counsel for Appellee*


_____

OPINION OF THE COURT
_____

RESTREPO, Circuit Judge

The Constitutional guarantee of free expression is a pillar of our democracy, and yet, it can be a bitter medicine— particularly when prescribed in defense of social media's more antisocial viewpoints.  In 2019, the City of Philadelphia took disciplinary action against twelve police officers for using Facebook to openly denigrate various minority groups and glorify the use of violence.  The Appellant officers alleged that these actions constituted First Amendment retaliation, but the District Court dismissed their lawsuit for failure to state a claim, after concluding that their base and hateful speech was unprotected by the First Amendment.

This Court does not condone the Appellant officers' use of social media to mock, disparage, and threaten the very communities that they are sworn to protect.  While we do not opine on the merits of their suit, our rules of procedure dictate that the Appellant officers have stated a claim for First Amendment retaliation at this juncture.  We must accordingly reverse the dismissal of the Appellant officers' claims and remand for further proceedings consistent with this Opinion.

## I.    BACKGROUND

Appellants are twelve current and former Philadelphia Police Officers (the "Officers") who were terminated, suspended, and/or disciplined after an online database aggregated and published highly offensive Facebook posts they and other officers nationwide had authored.  A major online news organization subsequently wrote an exposé about the posts, pushing them further into the public eye.  After learning of the posts, the Philadelphia Police Department ("PPD") launched an investigation and took action against the

Officers, in many cases finding their online activity had violated PPD's Code of Conduct. The Officers filed suit, alleging First Amendment retaliation.

The Officers now appeal the dismissal of their Amended Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). They criticize the District Court's conclusions—based on the pleadings alone—that (1) their posts raised little to no First Amendment value, and (2) any presumed value the posts had nonetheless could not outweigh the government's interests in suppression. In short, the Officers assert that it was inappropriate for the District Court to make factual findings and dismiss their claims on an undeveloped record.

We echo the District Court's assessment that the Officers' social media posts are "offensive, racist, and violent." J.A. at 30. We likewise validate the City's interest in protecting a perception that police exist to serve the entire community regardless of race, ethnicity, national origin, religion, sex, gender expression, sexual orientation, or political beliefs. Posts like the Officers' have the capacity to confirm the community's worst fears about bias in policing, and we recognize that the effectiveness of public safety efforts in Philadelphia may well be at stake.

That said, the First Amendment requires a stronger factual tether than the District Court held when it dismissed the Officers' retaliation action. There are material gaps in the undeveloped record concerning (1) when certain posts were authored and by whom; and (2) which posts were even the subject of PPD's disciplinary actions. These gaps preclude an adequately particularized analysis of the public concern raised.

The current record also includes only unadorned speculation about the potential disruption the Officers' posts pose. Such speculation is facially insufficient, for example, to overcome causational questions about certain posts that had been public for years, purportedly without issue. Accordingly, we conclude that dismissal of the Officers' action was improper without a more developed record, and we will allow their retaliation claims to proceed to discovery.

## A. **The Officers' Posts Come to Light**

In 2019, the Plain View Project ("Plain View"), a nonprofit news organization, aggregated and published an online database of over 5,000 Facebook posts and comments made by current and former police officers around the country.[1] Plain View stated that the posts reflected officers' views on "race, religion, ethnicity and the acceptability of violent policing," and had the capacity to "undermine public trust and confidence in our police." Plain View database. Plain View attributed around 3,000 of those posts to Philadelphia police officers.

---

[1] THE PLAIN VIEW PROJECT, https://plainviewproject.org/ (June 20, 2019) [hereinafter "Plain View database"]. We note that the Plain View database itself was not expressly incorporated into the Amended Complaint, but given that it is "integral to or explicitly relied on" therein, we may consider it in reviewing dismissal of the Officers' claims. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir. 1996), *superseded on other grounds by* PSLRA, 15 U.S.C. § 78u–4(b)(2)).

At issue in this case are the 250 posts Plain View attributed to the twelve Officer Appellants, a subset of which purportedly informed PPD's investigations and disciplinary actions. The posts were described by the District Court as having "spanned a multitude of topics such as protestors and their treatment, the use of violence against child molesters, Islam and its followers, refugees, police brutality, and much more." J.A. at 5–6. However, the posts also "ridiculed and belittled members from the LGBTQ community, reportedly using individuals who are transgender as punch lines in their jokes, or worse, threated violence against them . . . African Americans, Muslims, Mexicans, and foreign refugees were not spared as Plaintiffs played racist bingo, mocking as many ethnic or religious groups as possible." *Id.* at 30.[2]

On June 1, 2019, internet media, news, and entertainment company Buzzfeed News wrote a longform article about Plain View which republished a selection of the 5,000 posts with commentary about their impact on the community. The article highlighted several of Appellant Fenico's posts. According to the Amended Complaint, PPD Commanders held a meeting on June 6, 2019 to discuss the article. During this meeting, the Officers allege that First Deputy Commissioner Myron Patterson acknowledged that the focus of the Buzzfeed article was a critique of "right wing

---

[2] The Officers state in their briefing that "there is no evidence in the record to suggest that the Plaintiffs' Facebook posts, many of which date back six or more years, [are] still actively displayed on their Facebook accounts in June of 2019." Appellants Br. at 6. However, these statements are not reflected as allegations in their Amended Complaint and this Court is careful to treat them accordingly.

posts," and implied that his concerns were similarly aligned. J.A. at 43–44.

The Buzzfeed article led PPD to initiate an investigation into the underlying posts. Based on the results of that investigation, 72 PPD officers were placed on restricted duty or suspended. According to the Amended Complaint, at least five of the twelve Officers involved in this action were formally charged with violating one or both of the following provisions of the Department's Disciplinary Code:

> "Conduct Unbecoming" — "Any incident, conduct, or course of conduct which indicates that an employee has little or no regard for his/her responsibility as a member of the Police Department." Article I, Section 1-§ 021-10.

> "Neglect of Duty" — "Failure to comply with any Police Commissioner's orders, directives, memorandums, or regulations; or any oral or written orders of superiors." Article V, Section 5-§ 011-10.

> *Id.* at 45.

Some Officers' disciplinary charges also cited PPD's "Social Media and Networking" Policy, Directive 6.10, which prohibits the use of ethnic slurs, personal insults, profanity, material that is harassing, defamatory, fraudulent, or content that would otherwise not be acceptable in a City workplace, and puts officers on notice that "personal use of social media has the potential to impact the department as a whole, as well as individual members serving in their official capacity." *Id.* at 90–95.

In addition to the Disciplinary Code, PPD maintains a code of ethics and set of directives to which all employees must swear an oath. This includes that "[officers] will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence [their] decisions" and that they "will enforce the law courteously and appropriately, . . . never employing unnecessary force or violence." S.App. at 21. PPD Officers also vow to "recognize the badge of [their] office as a symbol of public faith, and [] accept it as a public trust to be held so long as [they are] true to the ethics of the police service." *Id.*

The Officers allege that their speech was protected by the First Amendment and as such, the punishment imposed on them—rooted in the above policies or not—violates the Constitution. They seek declaratory judgment, nominal damages, and compensatory damages in the amount of $2 million per Officer for economic harms, mental anguish, humiliation, embarrassment, and emotional injury.

### 1. *The Officers*

In this appeal, we must address the First Amendment value of each of the twelve Appellant Officers' social media posts. A brief summary of each of the Officers and a selection of their social media posts is below. Because we are reviewing the grant of a motion to dismiss, we accept the Officers' allegations as true.

### 2. *Christian Fenico*

Appellant Fenico joined PPD in 2003. At the time of the events in question, Fenico served in the S.W.A.T. Unit. On

8

or about June 6, 2019, Fenico was ordered to surrender his firearm and was placed on restricted duty pending an Internal Affairs Bureau ("IAB") investigation into his Facebook posts. In an interview with the IAB, Fenico was shown his eight Facebook posts featured on Plain View from 2012 to 2015 that were deemed troublesome. PPD ultimately terminated Fenico for "conduct unbecoming" and "neglect of duty."

The Plain View database reflected eight posts with content attributed to Fenico under the username "Chris Joseph," posted between 2012 and 2015.[3] J.A. at 12. All of these posts were appended to the Amended Complaint. In response to a 2015 shared post describing refugees rejecting a delivery of food because it bore the Red Cross logo, Fenico commented, "Good, let them starve to death. I hate every last one of them." S.App. at 29. In a 2013 post, Fenico commented, "Should have shot him," on an article detailing a theft in Missouri. *Id.* at 26.

### 3.   *Thomas Young*

Appellant Young joined PPD in April 1990. At the time of the events in question, Young held the rank of Corporal. On June 5, 2019, Young was placed on restricted duty and told to surrender his weapon due to an IAB investigation. During a subsequent meeting with the IAB, Young was shown several of his Facebook posts; he confirmed that the posts were his and that no one else had access to his computer. On July 17, 2019,

---

[3] The date ranges listed for each Officers' posts are based on those for which date information is apparent from the face of the post; however, many do not include this information as displayed in the Plain View database or the appendices.

the IAB served Young with a notice of disciplinary action involving a 30-day suspension with the intent to dismiss on account of his Facebook posts.  On July 19, 2019, rather than forfeit his insurance benefits by termination, Young retired.

The Plain View database reflected eighteen posts from 2013 to 2017 attributed to Young under the username "Tom Young," all of which were appended to the Amended Complaint.[4]  J.A. at 13.  Most are comments on others' posts.  In a post from 2015, Young commented on a shared YouTube link titled, "*Migrant Workers are Thrown Over Motorway Barrier by Police*."  S.App. at 254.  Young replied, "They should gather them up and send them back to where they came from."  *Id.*

### 4.    *Thomas Gack*

Appellant Gack joined PPD in 1993.  On June 7, 2019, Gack was placed on restricted duty and was ordered to surrender his service weapon pending an investigation into his Facebook posts.  On June 11, 2019, Gack reported to the IAB for an interview where he was shown 37 of his Facebook posts.  Gack initialed each page to confirm that each post was authored by him.  Gack was also instructed to disclose any other screennames or private social media accounts, or he would be cited for failure to cooperate with an internal investigation.  On July 19, 2019, PPD terminated Gack for "conduct unbecoming" and "neglect of duty."

---

[4] We note that one of the posts attributed to Young and appended to the Amended Complaint does not reflect his name; it is unclear if this was an attribution error, a redaction error, or some other issue.  S.App. at 254.

The Plain View database reflected 34 posts attributed to Gack from 2013 to 2017, all of which were appended to the Amended Complaint.  In one 2015 post, Gack shared a meme depicting a box of shotgun shells edited to read, "ISIS LOAD, 00 BUCK & BACON BITS."  S.App. at 60.  Gack added a caption above the post that read, "Getting shotgun reloading setup immediately……..and making a ton of these for the Apocalypse!!!!!"  *Id*.  In another post, Gack mocked female politicians.  One of Gack's 2013 posts highlighted in Plain View reflects the comment "Ha ha ha" in response to another's post mocking families with incarcerated fathers.  *Id.* at 58.

### 5.    *Edward McCammitt*

Appellant McCammitt joined PPD in 1986.  At the time of the events in question, he served in the Traffic Division.  On July 19, 2019, the IAB served McCammitt with a disciplinary action of a 30-day suspension with intent to terminate, on account of his Facebook posts.  It is not clear if McCammitt was shown the posts deemed problematic during the course of these disciplinary proceedings.  Subsequently, McCammitt was ordered to turn in his badge, identification, and equipment for "conduct unbecoming" and "neglect of duty."  On July 23, 2019, he requested early retirement to retain his medical coverage, but PPD ultimately deemed him "resigned."  J.A. at 57.

The Plain View database reflected 23 posts attributed to McCammitt from 2015 to 2017, all of were were appended to the Amended Complaint.  In 2017, McCammitt shared a picture of an officer spraying a protester with mace with the caption, "PARTICIPATION TROPHIES . . .  NOW IN LIQUID FORM!"  S.App. at 68.  In a 2017 post, he shared a

picture of a bumper detached from a vehicle, with the caption, "THIS BUMPER WILL TAKE AN ANIMAL HIT AT 65 MPH . . . OR A PROTESTER, WHATEVER." *Id.* at 69. One of McCammitt's posts from 2015 says "Like and share . . . If you support the Confederate flag." *Id.* at 85.

### 6.    *Tanya Grandizo*

Appellant Grandizo joined PPD in 1995. At the time of the events in question, she held the rank of Corporal. In June 2019, Grandizo was placed on restricted duty pending an investigation into her private Facebook posts. It is unclear if Grandizo was shown her posts deemed problematic during the course of the investigation. In March 2020, Grandizo was suspended for thirty days in connection with her Facebook posts. At the time of the Amended Complaint, Grandizo was still a member of PPD.[5]

The Plain View database attributed nine Facebook posts from 2013 to 2016 made by the username "Tanya Grandizio," to Grandizo,[6] all of which were appended to the Amended Complaint. S.App. at 87–95. In 2015, Grandizo shared a news article with no additional commentary titled, "*Obama: In the Muslim Immigrant Today, We See the Catholic Immigrant of a*

---

[5] The Amended Complaint is not explicit about whether certain of the Officers remain employed by PPD, but for purposes of this Opinion, it is assumed that unless otherwise indicated, the Officers in question remained on the police force in some capacity at the time of the Amended Complaint.

[6] We note that there is some confusion about the spelling of Grandizo's name throughout the pleadings and briefing. For purposes of this Opinion, we will refer to her as "Grandizo."

*Century Ago*." *Id.* at 95. That same year, she reposted a list of all of the reasons why Muslims cannot be "good American[s]," which concluded, "Therefore, after much study and deliberation, perhaps we should be very suspicious of ALL MUSLIMS in this country" because they "cannot and will not integrate into the great melting pot of America." *Id.* at 91.

### 7.    *Anthony Anzideo*

Appellant Anzideo joined PPD in February of 2007. On June 12, 2019, he was called in by the Employee Assistance Program in response to his Facebook posts featured on Plain View. The following day, the IAB showed Anzideo his Facebook posts and asked him to initial and acknowledge each page as the author. The IAB subsequently served Anzideo with a series of "75-18" reports (a disciplinary report as a result of an investigation) and he was cited with "neglect of duty." According to the Amended Complaint, "there were a total of four or five posts with which the department took issue out of the thirty-eight posts reviewed." J.A. at 62. In total, Anzideo remained on restricted duty for approximately sixty days. At the time of the Amended Complaint, Anzideo was still a member of PPD.

The Plain View database reflected 38 posts attributed to Anzideo from 2010 to 2016, but only five are appended to the Amended Complaint, presumably reflecting those that Appellants allege were shown to Anzideo during his disciplinary proceedings. Among the five posts was a link Anzideo shared to a "USATODAY.COM" news article from 2015 reading "*9 Dead in shooting at black church in Charleston, S.C.*," to which Anzideo added the caption, "This is horrible..Hope they track this POS down and take him out." S.App. at 99. In 2016, in response to a news article he posted

from "6ABC.COM" titled "*Woman Shot and Killed in Lower Salford; 2ⁿᵈ Victim Shot in Lansdale*," Anzideo responded "POS...take him out." *Id.* at 98.

### 8.    *Anthony Acquaviva*

Appellant Acquaviva joined PPD in 1990.   On or around June 5, 2019, Acquaviva was removed from normal duties, reassigned, and was ordered to surrender his service weapon on account of his Facebook posts highlighted by Plain View.   Several weeks later, Acquaviva was informed that he had been placed on the "Giglio List"—which meant that he would be barred from testifying in court because of concerns about his credibility.[7]   Acquaviva maintains that he never received any charging or termination papers, and it is unclear if he was ever shown the posts that were the subject of PPD's actions against him.   Nevertheless, the Amended Complaint discusses that Acquaviva never attended his IAB hearing, despite being told to do so.   PPD ultimately told Acquaviva that he was being terminated, and he alleges that he was constructively discharged from PPD, despite his expressed desire to retire instead.

The Plain View database reflected seventeen posts attributed to Acquaviva from 2015 to 2016, sixteen of which were appended to the Amended Complaint.   In 2015 Acquaviva shared a post on Facebook from a fellow Officer in

---

[7] *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (holding that prosecution must disclose all information or material that may be used to impeach the credibility of prosecution witnesses where witness's credibility is "an important issue in the case").

this action, Joseph Przepiorka, depicting a man with a beard overlaid with text reading, "ALL I WANT TO DO IS MOVE TO YOUR COUNTRY, RAPE YOUR WOMEN, BOMB YOUR BUSES, RIOT IN YOUR STREETS AND DEMAND THAT YOU ACCEPT MY RELIGION. WHY CAN'T YOU BE MORE TOLERANT?" S.App. at 104. In 2015, Acquaviva shared another post with a graphic of the United States overlaid with the text "FUCK OFF WE'RE FULL." *Id*. at 115. In a 2016 post, Acquaviva shared an image of generic police officers with the text, "SHARE IF YOU THINK IT SHOULD BE LEGAL . . . TO THROAT PUNCH A CIVILIAN THAT SPITS ON A MAN IN UNIFORM." *Id.* at 102.

### *9.    Kristine Amato*

Appellant Amato joined PPD in 1990. On June 5, 2019, she was ordered to surrender her service weapon and assigned to desk duty. In June 2019, she was shown "twelve to fourteen" Facebook posts attributed to her on the Plain View database, which she initialed to acknowledge authorship. J.A. at 67–68. PPD served Amato with a "75-18" Disciplinary Action for violating its Social Media Policy. Amato spent a total of approximately 30 days on suspension without pay. At the time of the Amended Complaint, Amato was still an active member of PPD.

The Plain View database reflected twelve posts with commentary attributed to Amato under the username "Yo Stuff" from 2012 to 2017, all of which were appended to the Amended Complaint. S.App. at 116–28. Unlike most of the other Officers, all of the posts attributed to Amato were comments Amato wrote on others' posts; it does not appear that she authored any of the original posts herself. Responding to a 2017 post by Appellant Przepiorka about an article titled

"*YouTube fight video shows what not to do when the cops come,*" Amato commented "She's a racist reporter… plain and simple…. she not only took a swing at the cop but also continued to resist and strike the officer…" *Id*. at 124.  In 2017, Amato responded to a video shared by another titled "*Tulsa Officer Uses Car To Run Down Armed Suspect,*" with the comment, "Awesome.. hopefully the wheels went over her scumbag ass." *Id.* at 126.

### 10.    *Joseph Przepiorka*

Appellant Przepiorka joined PPD in 1989.  At the time of the events in question, he held the rank of Sergeant.  On June 4, 2019, Przepiorka's supervisor informed him that the was being reassigned and that he would need to surrender his service weapon as a result of his Facebook activity.  Przepiorka faced charges for "conduct unbecoming" and "neglect of duty" for the Facebook posts attributed to him on Plain View, though it is not clear if he was ever shown the posts that were deemed problematic.  Przepiorka was ordered to report to the IAB to sign his 30-day suspension with intent to dismiss.  However, on July 25, 2019, he retired for insurance purposes.

The Plain View database reflected 93 posts attributed to Przepiorka from 2015 to 2017, all of which were appended to the Amended Complaint.  One of Przepiorka's posts from 2017 depicted a skeleton draped in the American flag and touting an automatic weapon with the words, "DEATH TO ISLAM" at the top.  S.App. at 130.  In 2017, Przepiorka shared a picture of professional wrestler Steve Austin emblazoned with the confederate flag and the text, "Give Me A Hell Yeah FOR TRUMP." *Id.* at 138.  In another post, he shared a picture of a white cap embroidered with the words, "MAKE AMERICA NOT    A    BUNCH    OF    CUNTS    OFFENDED    BY

EVERYTHING AGAIN." *Id.* at 148. Przepiorka also often shared articles that included mugshots of individuals who had been recently arrested.

### 11.    *William Bowdren*

Appellant Bowdren joined PPD in 1996. At the time of the events in question, Bowdren served on the Gun Violence Task Force as a Detective. On June 7, 2019, Bowdren's Commanding Officer notified him of a pending investigation into his Facebook activity, and collected his service weapon. Additionally, Bowdren was asked to sign IAB documents and was placed on strict desk duty. The Amended Complaint discusses that the allegations against Bowdren "mirrored those against the other Plaintiffs," and that he was made to sign various "75-18" disciplinary reports, though it is unclear if he was shown his social media posts that were deemed problematic. J.A. at 75. On July 31, 2019, Bowdren was placed on the Giglio List. PPD subsequently removed Bowdren from the Gun Violence Task Force. At the time of the Amended Complaint, Bowdren was still a member of PPD.

The Plain View database reflected fourteen posts attributed to Bowdren from 2012 to 2017, all of which were appended to the Amended Complaint. Most of the posts were shared news articles with Bowdren's response appended as a comment or caption. As an example, Bowdren commented, "Vroom Vroom" on an article he shared in 2017 titled, "*Tennessee Passes Bill Allowing People To Hit Protestors Blocking Roads*." S.App. at 232. In 2017, Bowdren shared an article from "6ABC.COM" titled "*Mother and boyfriend both charged in teen's murder*," to which he added the caption, "These animals need to be tortured and mutilated in a public square." *Id*. at 242.

### 12.    *Raphael McGough*

Appellant McGough joined PPD in 2003.  At the time of the events in question, he served in the role of Detective.  In connection with his Facebook posts featured on Plain View, McGough was placed on the Giglio List, reprimanded, and faced up to a five-day suspension.  One of McGough's "75-18" disciplinary reports stated that his posts were racist, sexist, and homophobic in nature, though it is unclear if he was shown the posts that were deemed problematic.  On December 12, 2019, McGough received a letter of reprimand.  At the time of the Amended Complaint, McGough was still a member of PPD.

The Plain View database reflected 24 posts attributed to McGough under the username "Ray McGough," nine of which were appended to the Amended Complaint.  S.App. at 258–66.  Most of those nine posts appear to be from 2017, and are shared news articles.  In 2017, McGough shared an article titled, "*UPDATING: In Progress – Antifa Marching To Confront Patriots Decide To Take On Police*," on which McGough commented, "[a]nd we know who the liberal scum are rooting for."  *Id*. at 258.  In another post, McGough commented, "You reap what you sow," in response to an article on "BREITBART.COM," with the title "*Baltimore Residents Blaming Murder Increase on Lack of Police After BLM Protesters Demanded Pullback*."  *Id*. at 259.  Without any caption, McGough shared another article seemingly attributed to the Blue Lives Matter organization with the headline: "*Police Use Officer Amy Caprio's Handcuffs to Arrest All Of Her Alleged Killers*."  *Id*. at 265.

### 13.    *Francis T. Sheridan*

Appellant Sheridan joined PPD in 1990.  At the time of the events in question, he served on the FBI Joint Terrorism Task Force as a Detective.  On or around January 27, 2020, Sheridan was issued "75-18" disciplinary documents, and was threatened with a reprimand.  At the time of the Amended Complaint, Sheridan had yet to have a hearing regarding the charges against him, despite that he allegedly requested one.  At the time of the Amended Complaint, Sheridan was still a member of PPD.

The Plain View database reflected two posts with content attributed to Sheridan under the username "Frank Sheridan" from 2014 and 2017, both of which were appended to the Amended Complaint.  S.App. at 268–69.  Like Officer Amato, Sheridan does not appear to have created any of the posts in question; he only commented on them.  In the 2014 comment, Sheridan responded to another's shared link bearing the text "CHILD RAPIST RAPED" and a graphic photo with the comment "Thank God for Prison Justice!"  *Id*. at 268.  In the 2017 comment, Sheridan responded to a news link captioned "*A teenager arrested for raping a baby will avoid prison*," with the comment, "If this is a true story, these assholes need to be exterminated!"  *Id*. at 269.

### B.  Procedural History

The Officers sued the City on July 8, 2020, and filed an Amended Complaint on October 7, 2020.  The Officers alleged that the disciplinary actions taken against them violated the First Amendment, Article I, § 7 of the Pennsylvania Constitution, and the Due Process Clause of the Fourteenth Amendment.  The City filed a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  The District Court granted the City's motion as to all claims, most importantly

concluding that the Officers "have failed to establish a First Amendment retaliation claim. Although they spoke in their capacity as private citizens and some of their posts involve matters of public concern, [the Officers] fail to show that their right to free speech outweighs the government[']s interest in regulating that speech." J.A. at 25. On appeal, Appellants only pursued their First Amendment retaliation claim.

## II.    ANALYSIS

### A. <u>Jurisdiction & Standard of Review</u>

The District Court had jurisdiction under 28 U.S.C. § 1331 and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We review a district court's grant of a motion to dismiss *de novo*. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

"The district court may not make findings of fact and, insofar as there is a factual dispute, the court may not resolve it." *Flora v. County of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) (vacating order granting Rule 12(b)(6) dismissal of First Amendment retaliation claim because district court erroneously made findings of fact as to scope of public employee plaintiff's duties). A plaintiff will not prevail on mere "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Instead, a plaintiff must detail

"enough facts to raise a reasonable expectation that discovery will reveal evidence of" each necessary element of the claims alleged in the complaint. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether they are entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000).

## B. First Amendment Retaliation

As an initial matter, "[s]peech by government employees receives less protection than speech by members of the public." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3d Cir. 2022). However, "public employees do not surrender all of their First Amendment rights merely because of their employment status." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 465 (3d Cir. 2015), *as amended* (Oct. 25, 2019).

To plead a First Amendment retaliation claim, a government employee must allege "(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). To show that their speech is protected, the employee must establish first that: (1) in making it, they spoke as a private citizen, and (2) the statement involved a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If these two elements are satisfied, "the possibility of a First Amendment claim arises." *Id.* The court must then determine, under the test elaborated in *Pickering v. Board of Education of Township High School District 205, Will County,*

*Illinois*, if the employee's interest in speaking outweighs the government's interest in avoiding disruption to its operations. 391 U.S. 563, 568 (1968); *Munroe*, 805 F.3d at 466.

The inquiry into the protected status of speech is a question of law, not fact. *Hill,* 455 F.3d at 241. However, it is a question of law that nonetheless requires a robust factual basis, given that *Pickering* sets forth a uniquely "particularized" balancing test, not a simple burden-shifting threshold. *Connick v. Myers*, 461 U.S. 138, 149–50 (1983). Indeed, "the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Id*. at 150. As a result, the extent to which speech touches on matters of public concern cannot be answered with a simple "yes" or "no," as the more substantially an employee's speech involves matters of public concern, the higher the state's burden will then be to justify taking action, and vice versa. *See id*. at 150–52 (rejecting approach which treated the question of public concern as a "threshold inquiry," then shifted burden to government to demonstrate interference with its responsibilities); *see also Locurto v. Giuliani*, 447 F.3d 159, 174 (2d Cir. 2006) ("a negative answer to the public concern question [is] not meant to license wholesale Government disregard of employee speech rights, especially outside of the workplace") (citing *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995)). Rather, as this Court has recognized, the public concern inquiry "involves a sliding scale in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." *Munroe*, 805 F.3d at 472 (internal quotation omitted).

Here, the City conceded that for purposes of their motion to dismiss, the Officers spoke as private citizens and their speech involved matters of public concern. They claim on appeal that this concession *arguendo* ends the public concern inquiry, reasoning that "this Court need not consider whether these posts passed the 'public concern' threshold," because they could not possibly succeed at *Pickering* balancing. Appellee Br. at 36. Essentially, despite their concession, the City concludes that any presumed public concern raised by any of the posts is nonetheless so minimal that the Officers' interest in speaking could not, under any circumstances, outweigh PPD's interest in avoiding a disruption to their operations. As such, they advance that the posts are not protected by the First Amendment, and dismissal is proper.

The City's arguments not only improperly propose a threshold finding of nominal public concern as to all 250 posts without individualized analysis, but advocate that such a finding is not even necessary in order to perform *Pickering* balancing. This conflicts with the "sliding scale" approach elucidated in *Munroe* and its antecedents, which requires a more nuanced understanding of both the precise public concern posed and the contours of the government's interest before balancing the two. 805 F.3d at 472. Because the record is insufficient here to inform proper *Pickering* balancing, we conclude that dismissal is not appropriate at this stage.

This is not "one of those rare case[s]" where the pleadings suffice to answer unavoidable questions about the public concerns raised by the employee's speech and the likelihood of disruption that it posed. *Craig v. Rich Twp. High School Dist. 227*, 736 F.3d 1110, 1121 (7th Cir. 2013) (internal

quotation omitted) (affirming dismissal of guidance counselor's retaliation claim, as complete text of inappropriate book he indisputably authored had been incorporated in full into complaint, providing "an adequate basis to perform the *Pickering* balancing test").[8]

Rather, this suit involves twelve individual speakers who uttered 250 discrete statements covering a broad variety of controversial topics over a period of six or more years. The public concerns raised and potential disruption posed by these statements are simply too complex to adequately resolve *Pickering* balancing in the City's favor without more tailored factual development and analysis. While the Officers undoubtedly face a steep uphill battle in ultimately proving their case, the allegations in their Amended Complaint entitle them an attempt to develop it in discovery. For the reasons that follow, we will reverse the dismissal of the Officers' First Amendment retaliation claim and remand for further development of the factual record.

### 1.    *Matters of Public Concern*

The District Court's "public concern" analysis suffered from both factual oversights and legal errors, both of which must be remedied on remand. Although ultimately a question

---

[8] *See also Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (affirming dismissal where medical director's high-level role and the defiant nature of his public disagreement with supervisor's policies was so clearly likely to disrupt relationship with supervisor that his pleadings alone "establish[ed] that he cannot prevail on his First Amendment claim").

of law, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 384–85 (1987) (citation omitted). At the "public concern" stage of the analysis, the value of the speech at issue is "undiminished by the fact [of the speaker's] state employment." *Berger v. Battaglia*, 779 F.2d 992, 1000 (4th Cir. 1985) (citing *Connick*, 461 U.S. at 157). In other words, that the speech was uttered by a police officer does not affect the extent to which it might touch on matters of public concern; that factor is only relevant at the balancing phase of the inquiry.

Speech relates to a matter of public concern when "it can be fairly considered as relating to any matter of political, social or other concern to the community," as opposed to a purely private intraoffice grievance. *Munroe*, 805 F.3d at 467 (quoting *Connick*, 461 U.S. at 146) (internal quotations omitted). The 250 posts flagged by Plain View, which the Officers appended in part to their Amended Complaint, appear to clear this first hurdle: none of the posts relates solely or even primarily to private grievances in which the public might have little interest. Even setting aside the City's concession to this effect, the Officers have adequately pled at this stage of the proceedings a claim that their speech was of some public concern.

However, that is not to say that this case was ripe for *Pickering* balancing. As an initial matter, the record is fatally inconclusive as to which of the Officers' posts were the subject of PPD's disciplinary proceedings against each Officer. The District Court sought to avoid this deficiency by concluding that the "prejudiced and violent" and "racially charged" nature

of the posts as a whole endowed them with "less First Amendment protection" and that as such, "any and all of the posts Plaintiffs provided in their Amended Complaint are sufficient to establish disciplinary action."  J.A. at 25, 27.

However, there were gaps in the record preventing the District Court from arriving at this blanket conclusion.  For at least two posts in the record, the Officer to which the posts were attributed appears not to have created, shared, or commented on them,[9] and at least one post appearing in the Plain View database and referenced in the Amended Complaint was excluded from the record entirely.[10]  We do not purport to establish a specific minimum degree of particularity at which a court must evaluate the public concern raised by

---

[9] One of the posts attributed to Appellant Young, which refers to Syrian refugees as "goat Humpers," was neither commented on nor posted by him.  S.App. at 254.  Another appears to have been posted to Appellant Grandizo's page, mocking a Black athlete's emotional reaction to being sentenced to several years in prison, without any indication that she was involved in or endorsed it.  It could be that these mismatches are the result of a redaction or attribution error, but on their face, the posts could not have provided justification for discipline of any officer participating in this lawsuit.

[10] Of the seventeen posts in Plain View's database attributed to Appellant Acquaviva and referenced in the Amended Complaint, only sixteen were actually appended thereto and can be presumed to have formed the basis of the District Court's analysis.  As such, the District Court may never have even seen this missing seventeenth post, despite that it may well have informed PPD's decision to discipline him.

each plaintiff's speech in order to engage in fulsome *Pickering* balancing. Nevertheless, we conclude that any such minimum was not met here.[11]

First, not all speech of some public concern has equal value under the First Amendment. Far from it. Rather, under the "sliding scale" approach to *Pickering* balancing, the degree of public concern raised dictates the government's burden to show likely disruption. *See Munroe*, 805 F.3d at 472. Courts are instructed not to treat "public concern" as a threshold, but as a matter of degree. *See Connick*, 461 U.S. at 151. Yet, the City advocates on appeal that in accepting the City's concession as to public concern, we should assign a uniform nominal First Amendment value to all 250 posts—all without knowing which posts are even relevant to the inquiry. *Pickering* requires more from courts that apply it. After discovery, it could well be the case that the suite of posts that informed a particular Officer's discipline holds so little First Amendment value that the government's burden to show likely disruption is indeed minimal. However, in this instance, the District Court on remand cannot proceed to the second step of *Pickering* balancing without knowing what that burden will be

---

[11] It is for this same reason that we cannot at this stage make a determination as to the last prong in the test for First Amendment retaliation claims, whether "the protected activity was a substantial factor in the alleged retaliatory action," either. *Hill*, 455 F.3d at 241–42. The Officers have pled that they were disciplined on account of their allegedly protected speech. Lacking sufficient information to determine what speech is implicated, much less whether it is protected, we must accept these well-pled causational allegations as true for purposes of the City's motion to dismiss. *Hill*, 455 F.3d at 234.

based on the actual, rather than the assumed value of the speech at hand.[12]

Second, the District Court's aggregate legal assessment of the marginal public concern the posts raise skirts one of the more uncomfortable but important features of First Amendment doctrine. Namely, the "inappropriate or controversial nature" of the speech is not relevant to whether it touches on matters of public concern – it is only a factor in evaluating its disruptiveness during *Pickering* balancing. *Munroe*, 805 F.3d at 470 ("humor, satire, and even 'personal invective' could be used in order to make or embellish a point about a matter of political, social or other concern to the community"); *Hernandez v. City of Phoenix*, 43 F.4th 966, 978–79 (9th Cir. 2022) ("Speech that expresses hostility toward racial or religious minorities may be of particularly low First Amendment value at the next step of the *Pickering* balancing test . . . but its distasteful character alone does not strip it of all First Amendment protection.").

---

[12] We recognize that it is common practice for courts to assume for purposes of appeal that an employee was speaking on a matter of public concern, as the District Court did here. *See Munroe,* 805 F.3d at 470; *Locurto*, 447 F.3d at 175; *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 196 (2d Cir. 2003); *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002). However, these cases typically involve a singular statement or body of speech, which the court is then able to balance directly against the disruption posed. Such an approach is less appropriate where, as here, the precise body of speech at issue is disputed and involves hundreds of discrete statements by a dozen speakers touching on a wide variety of topics.

As such, even the most deeply troubling speech may be of concern to the public and warrant First Amendment protection—depending on the facts of the case. While it carries the potential to be inflammatory, speech touching on race relations is "inherently of public concern." *Connick*, 461 U.S. at 148 n.8; *Locurto*, 447 F.3d at 183 ("Whatever our own views of the quality and prudence of the plaintiffs' chosen means of expression, commentary on race is, beyond peradventure, within the core protections of the First Amendment."). Similarly, not all violent speech automatically falls outside of the First Amendment's protective shroud. *See Rankin*, 483 U.S. at 386 (holding that statements wishing harm on the President are of public concern); *In re Kendall*, 712 F.3d 814, 825 n.8 (3d Cir. 2013) (describing narrow categories outside of which various forms of violent speech are protected: "true threats," incitement to "imminent[] lawless action," and "fighting words"); *see also Bauer v. Sampson*, 261 F.3d 775, 783–84 (9th Cir. 2001), *as amended* (9th Cir. Oct. 15, 2001) ("Although [plaintiff's] writings have some violent content, they are hyperbole of the sort found in non-mainstream political invective and in context . . . are patently *not* true threats." (emphasis in original) (internal quotations omitted)).

To provide a concrete example, the Supreme Court in *Snyder v. Phelps* upheld a broad range of highly offensive protest signage criticizing specific religions ("Pope in Hell," "Priests Rape Boys"), celebrating violence against a particular group ("Thank God for IEDs," "Thank God for Dead Soldiers"), and condemning the LGBTQ community ("God Hates Fags," "Fags Doom Nations"). 562 U.S. 443, 454 (2011). Although far from "refined social or political

commentary," the Court held this speech "plainly relate[d] to broad issues of interest to society at large." *Id*.

Despite assigning the public concern raised by all 250 of the Officers' posts a dispositively negligible value, the District Court itself even observed distinctions between certain Officers' posts, undermining its one-size-fits-all approach. It noted that "[o]f all the Plaintiffs, McGough's posts were ones that could be deemed to more closely concern matters of public interest," covering topics like "politics, supporting police, an increase in murder rate on decreased police presence, and the death sentence of a convicted rapist[] in Ohio." J.A. at 20. The District Court was likewise "not convinced that all of the [Officers'] posts involved matters of public concern," underscoring several posts by Appellants Gack, McCammitt, Acquaviva, Przepiorka, and Bowdren that it found did not address public matters at all. *Id*. at 26.

At the very least, the District Court on remand must assess the degree of public concern raised by those posts that informed each Officer's disciplinary proceedings on an officer-by-officer basis, if not a post-by-post basis. It must also do so without considering the posts' vituperative tone so much as their underlying content. Because these are determinations that the District Court ultimately could not make without further record development, we must reverse its premature dismissal of the action.

## 2.    *Likely Disruption* & **Pickering** *Balancing*

Beyond our aforementioned inability to adequately evaluate the public concern raised by the Officers' posts, the underlying record also lacks sufficient support for the

likelihood of disruption the posts pose.  To be protected by the First Amendment, *Pickering* requires that the employee's interest in speaking outweigh the government's interest in promoting workplace efficiency and avoiding disruption.  391 U.S. at 568.  The government "has a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large, but that hand is not uncontrolled." *Watters v. City of Philadelphia*, 55 F.3d 886, 896 (3d Cir. 1995) (internal quotations omitted) (citing *Waters v. Churchill*, 511 U.S. 661, 671 (1994)).

Notably, an employer need not show that the speech in question caused actual disruption to its operations in order to satisfy *Pickering* – a reasonable likelihood of such disruption will suffice.   *Connick*, 461 U.S. at 152 (holding that an employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action").  In fact, the Supreme Court has "given substantial weight to government employers' reasonable predictions of disruption, . . . even . . . when the speech involved is on a matter of public concern." *Waters*, 511 U.S. at 673.

However, an employer must still establish likely disruption through record support, and courts have long required more than "unadorned speculation as to the impact of speech."  *Hall v. Ford*, 856 F.2d 255, 261 (D.C. Cir. 1988) (citing *Rankin*, 483 U.S. at 388–89); *see also Watters*, 55 F.3d at 898 (citing lack of evidence to support employer's assertion that destruction of particular relationships would disrupt office

operations in reversing judgment as a matter of law for employer).[13]

The District Court dispositively credited the City's interest, as stated in their motion to dismiss, in "(1) maintaining and preserving the public's trust and promoting a diverse workforce; (2) efficient prosecution; and (3) maintaining orderly internal operations and avoiding potential disruptiveness." J.A. at 27. In support of the likelihood that the Officers' social media would disrupt these interests, the City cited "increased national and local scrutiny and outcry against excessive force, police killings of unarmed Black men, and . . . call[s] to 'defund' the police." *Id.*

On appeal, the City argues that there are no further facts that the Officers could possibly show here to counter the City's threshold assertion of likely disruption, and as such, further record development would be futile. However, this Court's recent decision in *Amalgamated Transit Union Local 85 v. Port Authority of Allegheny County*, where we evaluated a

---

[13] *Cf. Mahanoy Area Sch. Dist. v. B. L. ex rel Levy*, 141 S. Ct. 2038, 2047 (2021) (noting lack of record evidence of likely disruption to classroom activities by student's social media posts at summary judgment, citing coach's testimony that she had "[no] reason to think that this particular incident would disrupt class or school activities"); *Cohen v. California*, 403 U.S. 15, 23 (1971) (reversing affirmation of conviction where "[w]e have been shown no evidence that substantial numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities with execrations like that uttered by Cohen").

similar argument for disruption after a three-day hearing, demonstrates the kinds of pertinent facts that could plausibly be solicited through further record development.  39 F.4th 95, 104 (3d Cir. 2022).

While distinct in a few key ways, *Amalgamated Transit* evidences that it is not impossible for an employee to show that their controversial speech is unlikely to cause disruption. There, public employees brought a First Amendment challenge to a transit authority's decision to discipline them for wearing face masks bearing political slogans such as "Black Lives Matter" or "Trump 2020."  *Id.* at 101.  As to the Port Authority's assertions of likely disruption posed by the face masks, "[t]he record show[ed] a lone employee complaint, three race-related incidents among Port Authority employees within the past fifteen years, wholly unrelated to and predating the mask rules, and electronic messages among employees expressing differing opinions about the Black Lives Matter movement."  *Id*. at 105.  It also revealed a lack of a temporal connection supporting the Port Authority's claims of potential disruption, given the transit authority's long-standing practice of allowing political buttons and hats in violation of its policies without any evidence of past disruption.  *Id*.  We accordingly concluded that the Port Authority could "demonstrate an only minimal risk that the Employees' speech would cause workplace disruption."  *Id*. at 104–05.

Evaluating the City's motion to dismiss for failure to state a claim, we must accept as true allegations in the Officers' Amended Complaint that their "private speech in the form of comments on social media did not cause any disruption within [PPD]; nor did it negatively impact the ability of the City to maintain discipline and relationships in the workplace."  J.A.

at 48, 50, 53, 58, 63, 69, 73. Viewing these allegations in the light most favorably to the Officers, as we must at this stage, this amounts to a claim that their posts had not and *would not* disrupt PPD's operations. Further, as in *Amalgamated Transit*, the Officers also allege that some of their posts were several years old,[14] raising yet unrebutted causal questions as to whether a uniform likelihood of disruption could extend to all 250 posts. Again, without casting judgment on the Officers' ability to counter the City's arguments about the disruptive power of such inflammatory social media activity, *Amalgamated Transit* exemplifies that it is at least plausible that the Officers may do so.

That said, the Supreme Court has deferred heavily to employers' reasonable interpretations of employee speech and predictions of disruption—especially where, as here, the employer has performed an internal investigation into the matter. *Waters*, 511 U.S. at 676 (looking to employer's reasonable understanding of speech in question rather than a jury's fact-determination, even where employer's understanding is inaccurate). And our sister Circuits have recognized that this is especially true for police departments, which face unique internal and external dynamics. *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201 (9th Cir. 2000) (affording considerable deference to police department as employer, as "[d]iscipline and esprit de corps are vital to its functioning"); *Locurto*, 447 F.3d at 179, 183 (rejecting heckler's veto concerns and finding disruption likely where police officers expressed bias against those they were hired to

---

[14] Further, as discussed above, the age of each post is not even readily discernible from the face of the Amended Complaint, the Plain View database, or the appendices.

protect—satisfying *Pickering* even where "plaintiffs' expressive interests [in the speech were] not insubstantial").

However, at this stage in the proceedings, no concrete support for the City's actions has been properly put forth, leaving an open factual dispute as to the likelihood of disruption posed by the Officers' posts.[15] The District Court erred in resolving this dispute in the City's favor at the motion to dismiss stage. *Flora v. County of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015).[16]

## III.   CONCLUSION

We accordingly reverse the District Court's dismissal of the Officers' First Amendment retaliation claims and remand for further record development.

---

[15] We also reject the District Court's determination that the fact that three Officers had been placed on a Giglio List as a result of their social media was sufficient to establish "actual disruption" as to all twelve Officers. J.A. at 31. The Court's treatment of the Officers as an impartible unit for purposes of *Pickering* balancing suffers the same flaw that befell its "public concern" analysis, as discussed above.

[16] *See also Hernandez v. City of Phoenix*, 43 F.4th 966, 979 (9th Cir. 2022) ("Although it seems likely that [police officer's offensive posts appearing on Plain View] could impede the performance of his job duties and interfere with the [] Police Department's ability to effectively carry out its mission, no evidence of the actual or potential disruptive impact caused by [his] posts is properly before us at this [motion to dismiss] stage of the proceedings.").